# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      No. CR 12-3182 JB

MANUEL VALENCIA,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Sentencing Memorandum and Motion for Variance, filed April 4, 2015 (Doc. 847)("Sentencing Memorandum"); and (ii) the Defendant's Motion to Reduce Sentence, filed May 5, 2015 (Doc. 893). The Court held a sentencing hearing on April 21, 2015, and a hearing on the Motion to Reduce Sentence on September 11, 2015. The primary issues are: (i) whether the Court should grant Defendant Manuel Valencia a mitigating role adjustment under U.S.S.G. § 3B1.2 or a familial relationship reduction under § 2D1.1(b)(16); (ii) whether the Court should vary from the advisory guideline range in fashioning an appropriate sentence for Valencia under 18 U.S.C. § 3553(a); (iii) what fine to impose upon Valencia, who has a total net worth of $230,000.00, but has also agreed to a money judgment in the amount of $28,000.00 as part of his plea agreement in this case; and (iv) whether the Court should reduce Valencia's sentence pursuant to rule 35(b) of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3573, or 28 U.S.C. § 2255. The Court will not grant Valencia a mitigating role adjustment under § 3B1.2, because there is no sound evidence that he is plainly among the least culpable of those involved in the Christopher Roybal Drug Trafficking Organization ("C. Roybal DTO") or less culpable than the average participant

in the C. Roybal DTO.  Additionally, because the Court has concluded that Valencia is not entitled to a 4-level minimal participant reduction under § 3B1.2(a), he is ineligible for a familial relationship reduction under U.S.S.G. § 2D1.1(b)(16).  The Court will also deny Valencia's request for a downward variance from the advisory guideline range in light of the § 3553(a) factors.  The Court will impose a fine of $99,801.98, payable at the rate of at least $625.00 per month.  Finally, the Court denies Valencia's Motion to Reduce Sentence because: (i) the Court cannot reduce his sentence pursuant to rule 35(b) of the Federal Rules of Criminal Procedure or 18 U.S.C. § 3573, because only Plaintiff United States of America can move to reduce a sentence under those rules or statutes; and (ii) Valencia cannot move to reduce his sentence pursuant to 28 U.S.C. § 2255, because the Court does not construe Valencia's Motion to Reduce Sentence as brought under 28 U.S.C. § 2255.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed April 1, 2015 ("PSR"), which the United States Probation Office ("USPO") prepared.  The Court will first outline the facts of Valencia's offense.  The Court will then briefly describe Valencia's criminal history, his other personal characteristics, and his financial condition.

### 1.      The Offense of Conviction.

In June, 2011, the Federal Bureau of Investigation ("FBI") initiated an investigation code named Operation Rain Check into co-Defendant Christopher Roybal as the sole target.  See PSR ¶ 21, at 9.  The investigation subsequently identified the C. Roybal DTO, and revealed nineteen individuals were involved in various capacities and roles.  See PSR ¶ 21, at 9.  Operation Rain Check involved numerous investigative techniques, including multiple controlled purchases of

kilogram-quantities of cocaine and multi-pound purchases of high grade marijuana using a confidential human source ("CHS-1").  PSR ¶ 22, at 9.

> The CHS-1 informed agents that C. Roybal was one of the most substantial cocaine dealers in Northern and Central New Mexico.  Based on statements made by C. Roybal to the CHS-1, Roybal was distributing approximately 15 kilograms of cocaine each week.  C. Roybal also informed the CHS-1 that he was also distributing high grade marijuana.  C. Roybal informed the CHS-1 that he was generating $60,000 in cocaine profits on a monthly basis.  The investigation identified C. Roybal as the leader of the DTO as he controlled the distribution of money flow on behalf of the Roybal DTO.

PSR ¶ 23, at 9.  The FBI's investigation into the C. Roybal DTO revealed that Valencia was involved in the C. Roybal DTO.  See PSR ¶¶ 30-31, at 13.

"From on or about January 2012 through on or about April 2012, Valencia was involved in a conspiracy to distribute cocaine in Las Vegas, New Mexico."  PSR ¶ 31, at 13.  Valencia supplied cocaine to C. Roybal, which C. Roybal, in turn, redistributed.  See PSR ¶ 31, at 13.  "Valencia frequently communicated with Christopher Roybal on his various cellular telephones."  PSR ¶ 31, at 13.  Valencia maintained three different telephone numbers during the conspiracy, and during the FBI's investigation, it received authorization to intercept communications over several of C. Roybal's telephones.  See PSR ¶ 31, at 13.  Several calls were wiretapped between C. Roybal, Valencia, and co-Defendant Anthony Padilla.  See PSR ¶ 32, at 13.  In the calls, FBI agents learned C. Roybal obtained one kilogram of cocaine from Valencia.  See PSR ¶ 32, at 13.  Padilla later complained about the quality of the cocaine C. Roybal provided to him, and C. Roybal and Valencia discussed the best way to address Padilla's quality concerns.  See PSR ¶ 32, at 13.

### 2. **Valencia's Criminal History up to the Underlying Crime of Conviction.**

Valencia has been convicted of two alcohol related offenses.  See PSR ¶¶ 51-52, at 15.  First, on October 30, 1993, when Valencia was thirty-two years old, he was convicted in Mora

- 3 -

County for "Driving Under the Influence of Alcohol or Drugs."  PSR ¶ 51, at 15.  Valencia was

sentenced to fines and fees.  See PSR ¶ 51, at 15.  Regarding this conviction, the PSR provides

the following additional information:

> The defendant waived counsel.  It appears the defendant was also charged with
> the following offenses: Careless Driving; Assault on a Peace Officer; and
> Criminal Damage to property.  The dispositions of the other charges are unknown.
>
> On October 30, 1993, a traffic stop was conducted on the defendant's vehicle.
> The defendant performed poorly on standard field sobriety tests and refused to
> perform other field sobriety tests.  He also displayed signs of intoxication.  The
> defendant submitted a breach test that yielded a result of .15BAC.  The defendant
> was arrested.  Details of other offenses were not available.

PSR ¶ 51, at 15.  Second, on May 12, 1997, when Valencia was thirty-six years old, he was

convicted in San Miguel County of "Driving Under the Influence of Alcohol/Drugs."  PSR ¶ 52,

at 15.  Valencia was sentenced to fines and fees.  See PSR ¶ 52, at 15.  Regarding this

conviction, the PSR also states: "Attorney representation is unknown.  A charge of Failure to

Maintain Traffic Lane was dismissed.  On July 23, 1998, a bench warrant was issued for failure

to pay fines or costs.  The warrant was served on July 28, 1998.  On May 17, 2001, all

obligations were met."  PSR ¶ 52, at 15.

In 1985, Valencia was convicted of two traffic offenses in Amarillo, Texas: (i) speeding

(three counts); and (ii) driving without insurance.  See PSR ¶ 54, at 16.  Valencia was ordered to

pay fines and fees.  See PSR ¶ 54, at 16.  He was also charged with "Defective Tail Lamp,"

although the disposition for this charge is unknown.  PSR ¶ 54, at 16.  In 1996, Valencia was

convicted of "Careless Driving and Consume/Possess Open Container of Alcoholic Beverage in

the San Miguel County Magistrate Court in Las Vegas, New Mexico."  PSR ¶ 55, at 16.  He was

ordered to pay fines and fees, and a charge of "Failure to Maintain Traffic Lane was dismissed."

PSR ¶ 55, at 16.  Valencia was also arrested on two other occasions for alcohol related incidents.

See PSR ¶¶ 57-58, at 16.  First, on August 5, 1988, when Valencia was twenty-seven years old, the Colorado State Police; Trinidad, Colorado arrested him in Trinidad for "Driving Under the Influence."  PSR ¶ 57, at 16.  According to the PSR, information regarding the court, the case number, and the disposition is not available for this arrest.  See PSR ¶ 57, at 16.  The PSR further states: "The information was obtained from the National Crime Information Center.  The United States Probation Office for the District of Colorado conducted a collateral state-wide record check and did not locate record of an arrest in Trinidad, Colorado.  Lack of information may be due to the age of the arrest."  PSR ¶ 57, at 16.  Second, on August 23, 1992, when Valencia was thirty-one years old, the New Mexico State Police; Las Vegas, New Mexico arrested Valencia in an unknown city for "Driving While Intoxicated."  PSR ¶ 57, at 16.  According to the PSR, information regarding the court, the case number, and the disposition is not available for this arrest.  See PSR ¶ 57, at 16.  The PSR further states: "The arrest information was obtained from the National Crime Information Center.  Arrest and court records were not located for this offense."  PSR ¶ 57, at 16.

### 3.     Valencia's Personal Characteristics.

Valencia was born on November 10, 1960 in Las Vegas, New Mexico.  See PSR ¶ 60, at 17.  Valencia's father is retired from working on gas lines, and his mother is a housewife.  See PSR ¶ 60, at 17.  They also used to operate a boarding house and continue to reside in Las Vegas.  See PSR ¶ 60, at 17.  Valencia has five siblings, and reports that he had a good childhood and that his family had enough financially.  See PSR ¶¶ 61-62, at 17.  Valencia lived with his parents, but spent weekends with his grandfather because he loved being on his grandfather's ranch.  See PSR ¶ 62, at 17.  As a result, his grandfather helped raise him and legally adopted him, with which his parents did not have an issue.  See PSR ¶ 62, at 17.

- 5 -

Valencia's father suffers from cardiac issues and has undergone three bypasses/stints.  See PSR ¶ 63, at 17.  His father will need to have the same surgery again in June 2015.  See PSR ¶ 63, at 17.  Additionally, Valencia's sister, Olga, suffers from fibromyalgia and his brother, Marvin, "might have Lyme Disease."  PSR ¶ 63, at 17.[1]  Valencia also has two uncles[2], Orlando and Steve, who both passed away from Amyotrophic Lateral Sclerosis ("ALS"), more commonly known as Lou Gehrig's Disease, within the last five years.  See PSR ¶ 69, at 17.  Valencia's family members are aware of his incarceration and have been very supportive, although it has been "devastating" news for them.  PSR ¶¶ 64, 71 at 17-18.  "They pray every night for the defendant to come home."  PSR ¶ 71, at 18.

From 1980 to 1982, Valencia lived in Albuquerque, New Mexico, and from 1985 to 1987, he lived in Amarillo, Texas.  See PSR ¶ 65, at 17.  He has otherwise been a lifelong resident of Las Vegas, New Mexico.  See PSR ¶ 65, at 17.  Valencia's residence "consists of a

---

[1]The PSR sets forth somewhat contradictory information regarding Martin's condition. On page 17 of the PSR, it states that Valencia's "brother, Marvin, was recently diagnosed with Amyotrophic Lateral Sclerosis (ALS), more commonly referred to as Lou Gehrig's Disease (a neurodegenerative disease).  However, physicians are still running tests to confirm this diagnosis." PSR ¶ 63, at 17.  On page 18 of the PSR, however, it states:

> Mr. Valencia also stated the Defendant's brother, Marvin, also has fibromyalgia.  Doctors thought Marvin might have Lou Gehrig's disease, which terrified the family because of the deaths of Orlando and Steve from the same condition.  However, doctors now think Marvin may have Lyme Disease.  Lyme disease is caused by a bacteria transmitted by ticks that causes an infection of the joints, heart, and/or nervous system.

PSR ¶ 70, at 18.  The PSR is thus somewhat unclear whether Marvin has Lou Gehrig's Disease or Lyme Disease.  Paragraph 70, which states that doctors originally thought Marvin had Lou Gehrig's disease until they ran more tests, however, is consistent with paragraph 63 and leads the Court to conclude that Marvin does not have Lou Gehrig's disease.  The Court therefore concludes, by a preponderance of the evidence, that Marvin "might have Lyme Disease."

[2]While the originally disclosed PSR referred to Orlando and Steve as Valencia's brothers, the first addendum corrected that they were Valencia's uncles, and not his brothers.

larger, older single wide mobile home with three bedrooms and one bathroom." PSR ¶ 66, at 17.

His parents live in the primary residence on the lot. See PSR ¶ 66, at 17. Valencia's daughter

and her child also reside in a separate mobile home and there are horse corrals on the property.

See PSR ¶ 66, at 17. Valencia has reported that he and his girlfriend live next to his parents, and

that he is their primary caretaker. See PSR ¶ 67, at 17. "Although they are ambulatory, he has

concerns about someone being present to care for their needs." PSR ¶ 670, at 17. Regarding

Valencia's relationship with his parents, the PSR further states:

> Mr. Valencia noted the defendant's parents were reliant on him as their caretaker
> for shopping, doctor's appointments, etc. He said the defendant would never
> leave their side when he lived at home. Since his incarceration, it has been
> difficult for his parents, because everyone has their own family to care for.
> Additionally, the defendant's daughter, Alyssa, and her daughter reside on the
> same property. Mr. Valencia stated Alyssa is a young, struggling mother who
> was dependent on the defendant in many ways.

PSR ¶ 72, at 18.

Valencia has been in a relationship with Lydia Ulibarri -- aged thirty-eight years old --

since 1997. See PSR ¶ 74, at 18. She works as a coordinator for Tierra y Montes Soil and Water

Conservation.[3] See PSR ¶ 74, at 18. Ulibarri does not have any children, and Valencia still

speaks with her on a daily basis. See PSR ¶ 74, at 19. Valencia was previously married to

Sandra Valdez-Valencia from 1980 to 1990, with whom he has two children: Martin -- aged 31 -

- and Alyssa -- aged twenty-two. See PSR ¶¶ 75-76, at 19. When Valencia and Valdez-Valencia

divorced, Martin chose to live with Valencia, and Alyssa decided to live with Valdez-Valencia.

See PSR ¶ 76, at 19. "However, both parents shared responsibility of the children." PSR ¶ 76, at

---

[3]Tierra y Montes Soil and Water Conservation District -- located in Las Vegas -- "is a governmental subdivision of the state, a public body corporate and politic, organized for control and prevention of flood, sediment, and soil erosion damage, and to further the conservation, development and beneficial use of water and soil resources." DE'AUN WILLOUGHBY CPA, PC, TIERRA Y MONTES SOIL AND WATER CONSERVATION DISTRICT, ANNUAL FINANCIAL REPORT 13 (2014).

19.  Today, Martin lives in Montrose, Colorado, where he runs a plumbing business, and Alyssa lives in Las Vegas, New Mexico, where she works for Highlands University.  See PSR ¶ 76, at 19.  Valencia "speaks to his children daily and they have been supportive of him."  PSR ¶ 76, at 19.

Regarding Valencia's physical condition, he has reported that Dr. Michael Lopez diagnosed him with high blood pressure three or four years ago, and that he takes Lisinopril for this condition.  See PSR ¶ 80, at 19.  "Medical records from Dr. Michael Lopez indicate the defendant was seen in 2011," and that "[l]aboratory results indicated he had high glucose levels, high cholesterol, and high triglycerides."  PSR ¶ 82, at 19.  He also had "high blood pressure and hyperlipidemia (too many lipids/fats in the blood)."  PSR ¶ 82, at 19.  Valencia was "diagnosed as morbidly obese and pre-diabetic," and was "prescribed Lisinopril and was advised to diet and exercise."  PSR ¶ 82, at 19.  Valencia has never been diagnosed with a mental health issue, although he has reported experiencing anxiety symptoms after a home invasion in April 2012. See PSR ¶¶ 84-85, at 20.  Valencia first tried alcohol at the age of sixteen, and he drank socially on the weekends, sometimes to the point of intoxication.  See PSR ¶ 87, at 20.  "He eventually decided to stop drinking because it 'was not agreeing' with him.  He stated alcohol never interfered with his relationships or ability to work.  He said he has not consumed alcohol in about 15 years and has never attended counseling."  PSR ¶ 87, at 20.  Valencia reported that he first tried marijuana around the age of seventeen or eighteen, although he has not used it since 2012. See PSR ¶ 88, at 20.  According to Valencia, he used marijuana regularly -- approximately three times per week -- to self-medicate for symptoms of anxiety after experiencing the April 2012 home invasion.  See PSR ¶ 91, at 20-21.  The PSR states that "it was strongly suspected that the defendant might be minimizing his use history."  PSR ¶ 91, at 21.

4.      **Valencia's Financial Condition**.

Valencia's financial condition is important to the Court's imposition of a fine. Accordingly, the Court will discuss Valencia's education and employment.  The Court will also discuss his assets and his liabilities.

a.      **Education and Employment**.

Valencia attended West Las Vegas High School in Las Vegas, New Mexico.  See PSR ¶ 96, at 21.  He had poor grades in school and ultimately dropped out in the eleventh grade, because "he felt that school was not right for him."  PSR ¶ 96, at 21.  Valencia's son, Martin, notes that, "even though [Valencia] did not finish high school, he always had good jobs as a heavy equipment operator and/or ranch operator, and money was never an issue for him."  PSR ¶ 97, at 21.  Further, Valencia trained horses that, after several years, became valued at $50,000 to $100,000 each, and he has been a professional team roper for many years.  See PSR ¶ 97, at 21.  The defendant has reportedly been featured in magazines and made it to finalist competitions where the potential prize money was millions of dollars.  See PSR ¶ 97, at 21.

From approximately 2004 to 2007, Valencia worked as a heavy equipment operator for Albuquerque Underground in Taos, New Mexico.  See PSR ¶ 102, at 22.  He earned $16.00 per hour, and the reason for him leaving this employment is unknown.  See PSR ¶ 102, at 22.  During that same period, from approximately 2005 to 2008, Valencia worked for Marty Flores and Eddie Saiz in Taos, New Mexico, also as a heavy equipment operator.  See PSR ¶ 101, at 22.  Saiz later bought Mr. Flores' company.  See PSR ¶ 101, at 22.  According to Valencia, he worked for Saiz and Flores "off and on for approximately four years, and they primarily worked on contracts with PNM (Public Service Company of New Mexico)."  PSR ¶ 101, at 22.  Valencia states that "this was a temporary job, and he left this position when the work ended."  PSR ¶ 102,

at 22.  From 2008 to 2014, Valencia was self-employed in Las Vegas, New Mexico.  See PSR ¶
100, at 22.  According to Valencia, "he earned $700.00 per month from an investment after he
sold his ranch (prior to his arrest for the instant offense)."  PSR ¶ 100, at 22.  Further, Valencia
sold alfalfa, wood, and horses, and provided guided hunting tours and participated in
professional roping competitions.  See PSR ¶ 100, at 22.  Finally, from approximately July 2014
to January 20, 2015, Valencia worked as a heavy equipment operator for Enviro Works,[4] based
in Edgewood, New Mexico.  See PSR ¶ 99, at 22.  Valencia was based in Santa Fe, New Mexico
for the job and earned $16.00 per hour.  See PSR ¶ 99, at 22.  Enviro Works employed Valencia
until Valencia's incarceration for this federal offense, and Valencia reports that the company is
willing to rehire him.  See PSR ¶ 99, at 22.  "Employment records [from Enviro Works] were
requested, but not yet received."  PSR ¶ 99, at 22.

> b.  **Assets and Liabilities.**

The USPO reports that Valencia maintains: (i) a personal checking account at "Wells
Fargo -- Las Vegas, NM" that contains $4,000.00; and (ii) a personal checking account at "Bank
of Las Vegas -- Las Vegas, NM" that contains $2,000.00.  PSR ¶ 105, at 23.  Additionally,
Valencia "maintains a $100,000 contract with Edward Jones Investments which comprises part
of his stable income ($700 per month)."  PSR ¶¶ 105-06, at 23.  According to Valencia: "The
original investment was derived from the sale of his grandfather's ranch.  The proceeds of the
sale of the ranch were divided amongst several family members.  The defendant advised he may
be able to withdraw the money from the investment account, but may be penalized on the
withdrawal."  PSR ¶ 106, at 23.  He also owns a "1997 Horse Trailer" worth $4,000.00, PSR ¶

---

[4]Enviroworks, LLC provides site preparation services for a variety of construction
applications including road construction, commercial and industrial site preparation work,
remediation, demolition.  *See* *About* *Us*, ENVIROWORKS LLC,
http://www.enviroworksforyou.com/about-us/ (last visited Dec. 29, 2015).

105, at 23, and eight horses valued at $15,000.00 each, Transcript of Sentencing Hearing at 32:9-33:8 (taken April 21, 2015)(Court, McKeivier)("April Tr.").[5]  His assets, overall, are worth $230,000.00.[6]  See PSR ¶¶ 105-08, at 23; April Tr. at 32:9-33:8.  An Experian Credit Profile reveals no outstanding debts, but pursuant to Valencia's Plea Agreement, he agreed to a money judgment in the amount of $28,000.00.  See PSR ¶ 107, at 23.

## PROCEDURAL BACKGROUND

The Second Superseding Indictment, filed September 9, 2014 (Doc. 625)("Superseding Indictment"), charged Valencia with the following Counts: (i) Count 1, Conspiracy -- Distribution of 5 Kilograms and More of a Mixture and Substance Containing a Detectable Amount of Cocaine in violation of 21 U.S.C. § 846, and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and (ii) Count 54, Telephone to Facilitate a Drug Trafficking Offense in violation of 21 U.S.C. § 843(b).  See Superseding Indictment at 2, 27.  Valencia retained counsel -- Stephen D. Aarons of Santa Fe, New Mexico -- who entered his first appearance on December 18, 2012.  Subsequently, on October 3, 2013, Valencia retained Ashli Summer McKeivier -- of the

---

[5]The Court's citations to the transcript of the April 21, 2015, sentencing hearing and the September 11, 2015, hearing on the Motion to Reduce Sentence refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[6]The Court concludes that Valencia's total net worth is $230,000.00 by adding together the following assets:

| 1. | $4,000.00: Checking Account at Wells Fargo -- Las Vegas, NM. |
| 2. | $2,000.00: Checking Account at Bank of Las Vegas -- Las Vegas, NM. |
| 3. | $100,000.00: Investment contract with Edward Jones Investments. |
| 4. | $4,000.00: 1997 Horse Trailer. |
| 5. | $120,000.00: Eight horses valued at $15,000.00 each. |

**Valencia's Total Net Worth = $230,000.00**

PSR ¶¶ 105-06, at 23; April Tr. at 32:9-33:8 (Court, McKeivier).

Criminal Defense Group in North Hollywood, California -- who associated with Cynthia Marie

Armijo of Albuquerque, New Mexico.  On January 20, 2015, Valencia pled guilty to "a one-

count Information, charging a violation of 21 U.S.C. § 846, that being Conspiracy to Distribute

Cocaine."  Plea Agreement ¶ 3, at 2, filed January 20, 2015 (Doc. 742).  The Plea Agreement's

section titled "Defendant's Admission of Facts" states:

> 7.      By my signature on this plea agreement, I am acknowledging that I
> am pleading guilty because I am, in fact, guilty of the offense to which I am
> pleading guilty.  I recognize and accept responsibility for my criminal conduct.
> Moreover, in pleading guilty, I acknowledge that if I choose to go to trial instead
> of entering this plea, the United States could prove facts sufficient to establish
> my guilt of the offense to which I am pleading guilty beyond a reasonable doubt,
> including any facts alleged in the Information that increase the statutory minimum
> or maximum penalties.  I specifically admit the following facts relating to the
> charges against me, and declare under penalty of perjury that all of these facts are
> true and correct:

> 8.      From on or about January 2012 through on or about April 2012, I
> was involved in a conspiracy to distribute cocaine in the Las Vegas, New Mexico
> area.  To that end, I supplied cocaine to Christopher Roybal which he, in turn,
> redistributed.  During the course of the conspiracy, I frequently communicated
> with Christopher Roybal on his various and changing cellular telephones.  My
> phone numbers were (505) 429-3272, (505) 429-5613, and (575) 707-2870.
> Unbeknownst to me at the time, the Federal Bureau of Investigation had received
> authorization to intercept communications over several of Christopher Roybal's
> telephones.

> 9.      By signing this agreement, the Defendant admits that there is a
> factual basis for each element of the crime(s) to which the Defendant is pleading
> guilty.  The Defendant agrees that the Court may rely on any of these facts, as
> well as facts in the presentence report, to determine the Defendant's sentence,
> including, but not limited to, the advisory guideline offense level.

Plea Agreement ¶¶ 7-9, at 3-4.  In the Plea Agreement, Valencia also agreed "to the imposition

of a money judgment against the Defendant in the amount of $28,000.00, representing proceeds

of the offense charged in the single-count Information this amount being due at the time of the

Defendant's sentencing."  Plea Agreement ¶ 15, at 6.  Finally, the Plea Agreement contained a

section titled "Waiver of Appeal Rights:

## WAIVER OF APPEAL RIGHTS

16.     The Defendant is aware that 28 U.S.C. § 1291 and 18 U.S.C. § 3742 afford a defendant the right to appeal a conviction and the sentence imposed. Acknowledging that, the defendant knowingly waives the right to appeal the Defendant's conviction and any sentence, including any fine, at or under the maximum statutory penalty authorized by law.  In addition, the Defendant agrees to waive any collateral attack to the Defendant's conviction and any sentence including any fine, pursuant to 28 U.S.C. §§ 2241, 2255, or any other extraordinary writ, except on the issue of defense counsel's ineffective assistance.

Plea Agreement ¶ 16, at 7.

The USPO disclosed the PSR on April 1, 2015.  See PSR at 1.  "Pursuant to a written plea agreement, at least 500 grams but less than two kilograms of cocaine are attributable to the defendant.  Accordingly, the parties agree the defendant's base offense level under the sentencing guidelines is 24, pursuant to U.S.S.G. 2D1.1(c)(8)."  PSR ¶ 7, at 7.  The USPO does not apply any Chapter Two enhancements or a minimum role adjustment, but it applies a 3-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  See PSR ¶ 8, at 8.  The PSR thus calculates Valencia's total offense level to be 21.  See PSR ¶ 110, at 24.  The PSR also calculates a criminal history category score of 0.  See PSR ¶ 53, at 15.  Valencia's total offense level of 21 and criminal history category I results in a guideline imprisonment range of 37 months to 46 months.  See PSR ¶ 110, at 24.  The PSR also states that the "defendant agrees to the imposition of a money judgment against the defendant in the amount of $28,000, representing the proceeds of the offense charged in the single-count Information" and due at the time of sentencing.  PSR ¶ 11, at 8.  In light of Valencia's financial condition, the PSR states that, "[b]ased on available information, it appears the defendant has the ability to pay a fine."  PSR ¶ 108, at 23.  The PSR provides the following information regarding the costs of prosecution and cost data relevant to the imposition of any fine:

Costs of prosecution shall be imposed on the defendant as required by statute. U.S.S.G. § 5E1.5.  In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed.  U.S.S.G. § 5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs.  The most recent advisory from the Administrative Office of the United States Courts, dated June 24, 2014, provides the following monthly cost data:

|  | Bureau of Prison Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $80.25 | $72.91 | $8.66 |
| Monthly | $2,440.97 | $2,217.73 | $263.50 |
| Annually | $29,291.62 | $26,612.76 | $3,162.03 |

PSR ¶ 121, at 25.

The Court has already sentenced a number of Valencia's co-defendants: (i) C. Roybal received a sentence of 168 months imprisonment, see Judgment, filed July 31, 2015 (Doc. 1025), and agreed to the imposition of a money judgment in the amount of $184,080.00, see Money Judgment (Order of Forfeiture), filed April 10, 2015 (Doc. 884); (ii) George Roybal received a sentence of 97 months imprisonment, see Judgment, filed November 17, 2015 (Doc. 1070), and agreed to forfeit all his right's title and interest in a 2000 Chevrolet Monte Carlo SS, see Preliminary Order of Forfeiture, filed July 29, 2015 (Doc. 1019); (iii) Jonathon Ulibarri received a sentence of 51 months imprisonment, see Judgment, filed August 24, 2015 (Doc. 1047); (iv) Jerome Eckstein received a sentence of 15 months imprisonment and a fine of $46,100.55; (v) Cesar Ramirez received a sentence of 54 months imprisonment and a fine of $9,205.00, see Judgment, filed July 20, 2015 (Doc. 1002); (vi) Troy Crawford received a sentence of 5 months, see Judgment, filed July 20, 2015 (Doc. 1000); (vii) Michelle Johnson received a sentence of 5 years of probation, see Judgment, filed December 5, 2014 (Doc. 685); (viii) Kristen Lucero received a sentence of 5 years of probation, see Judgment, filed December 11, 2014 (Doc. 693);

(ix) Brandy Lucero received a sentence of 5 years of probation, <u>see</u> Judgment, filed December 11, 2014 (Doc. 692); (x) Isaac Gonzales received a sentence of 63 days or time served, whichever is less, and a fine of $8,217.78, <u>see</u> Judgment, filed June 2, 2015 (Doc. 946), and agreed to the imposition of a money judgment in the amount of $25,000.00, <u>see</u> Money Judgment (Order of Forfeiture), filed July 30, 2015 (Doc. 1022); (xi) Richard Sanchez received a sentence of 81 days or time served, whichever is less, <u>see</u> Judgment, filed July 20, 2015 (Doc. 1003), and agreed to the imposition of a money judgment in the amount of $10,000.00, <u>see</u> Money Judgment (Order of Forfeiture), filed June 24, 2015 (Doc. 972); (xii) Paul Ulibarri received a sentence of 21 months, <u>see</u> Judgment, filed June 1, 2015 (Doc. 943); (xiii) Tianna Candelaria received a sentence of 5 years of probation, <u>see</u> Judgment, filed December 5, 2014 (Doc. 686); and (xiv) Kenneth Ulibarri received a sentence of 60 months, <u>see</u> Amended Judgment, filed July 30, 2015 (Doc. 1024), and agreed to the imposition of a money judgment in the amount of $3,200.00, <u>see</u> Money Judgment (Order of Forfeiture), filed May 11, 2015 (Doc. 904). The PSR provides a chart outlining the individuals and co-defendants involved in the C. Roybal DTO:



1.    __The First Addendum__.

The USPO subsequently filed an addendum to the PSR, at which point neither Valencia

nor the United States had made objections to the PSR.  See First Addendum to the PSR at 1

("First Addendum").  First, after gathering additional information from the case agent, the First

Addendum maintains that no role adjustment is warranted in Valencia's case, explaining:

> Paragraph 34 of the PSR indicated the United States Probation Office was still
> trying to make contact with the case agent.  Following disclosure of the PSR, the
> United States Probation office made contact with the case agent.  The agent
> verified the defendant did not direct anyone else in the conspiracy and was not
> directed by anyone.  Investigators knew multiple phone calls occurred between
> Christopher Roybal and Manuel Valencia during the conspiracy, and Valencia
> distributed at least one kilogram of cocaine to Roybal.  Agents later learned the
> defendant's relationship with Christopher Roybal was ongoing for a long time
> prior to this offense.  The defendant also knew information about drug amounts
> and prices in the conspiracy.  The agent stated the defendant's ongoing
> relationship with Christopher Roybal, weight of the distributed substance (one
> kilogram of cocaine), and knowledge of the extent of the conspiracy did not
> suggest this was the first or only time that the defendant distributed cocaine.
> Based on this information, the United States Probation Office maintains that no
> role adjustment is warranted.  To date, neither the Government nor defense
> counsel have objected to this assessment.

First Addendum at 1.  The First Addendum also provides additional information that Valencia

provided to the USPO regarding his physical condition.  See First Addendum at 1.  Valencia

provides information about chronic back pain that he experiences because of a back injury in the

1980s.  See First Addendum at 1.  It also states that Valencia had a broken wrist and knee which

healed on their own, and that he has been informed that the knee requires surgery.  See First

Addendum at 2.  The First Addendum further clarifies that Orlando and Steve -- who passed

away -- were his uncles and not his brothers.  See First Addendum at 2.  Finally, regarding the

horses' value, the First Addendum states: "Paragraph 108 of the presentence report indicated the

defendant's son reported the defendant owns horses valued at $50,000 to $100,000 each.  The

defendant stated his son does not have any knowledge of horses, and indicated the horses are currently worth approximately $15,000 to $20,000 each." First Addendum at 2.

### 2.   **Valencia's Sentencing Memorandum.**

Valencia filed his Sentencing Memorandum on April 14, 2015.  <u>See</u> Defendant's Sentencing Memorandum and Motion for Variance, filed April 4, 2015 (Doc. 847)("Sentencing Memorandum").  In his Sentencing Memorandum, Valencia requests: (i) a 4-level reduction for his minimal participation under U.S.S.G. § 3B1.2; (ii) a 2-level familial relationship reduction under U.S.S.G. § 2D1.1(b)(16);[7] and (iii) a variance under the § 3553(a) factors.  <u>See</u> Sentencing Memorandum at 1.  Valencia contends that he was a minimal participant in the criminal activity and that he is therefore entitled to a 4-level reduction under U.S.S.G. § 3B1.2(a).  <u>See</u> Sentencing Memorandum at 10.  According to Valencia, § 3B1.2's application note 3(A) states that a defendant "who performs a limited function in a concerted criminal activity is not precluded from consideration for an adjustment under this guideline."  Sentencing Memorandum at 10. Valencia further explains the basis for his request for a minimal participant adjustment:

> Mr. Valencia did not seek to become involved in the distribution of cocaine.  He was approached by an individual who was an acquaintance of Christopher Roybal to facilitate a transaction between the two.  This unindicted co-conspirator owed Roybal money and could not approach him to unload his supply of cocaine.  He asked Mr. Valencia, due to his close relationship with Roybal, to act as if he had the source of supply and agreed to split any profits from the sale.  However, when it was discovered that the cocaine was of poor quality, no profits were ever realized and the unindicted co-conspirator stopped returning Mr. Valencia's phone calls.  This was the one and only transaction in which Mr. Valencia was involved.

---

[7]In his Sentencing Memorandum, Valencia does not explicitly refer to his requests under U.S.S.G. § 3B1.2 and U.S.S.G. § 2D1.1(b)(16) as objections.  In the First and Second Addendums, and at the sentencing hearing, however, various parties referred to Valencia's requests under U.S.S.G. § 3B1.2 and U.S.S.G. § 2D1.1(b)(16) as objections. For the purposes of consistency and to directly address the arguments that Valencia's Sentencing Memorandum raises, the Court will generally refer to Valencia's arguments under U.S.S.G. § 3B1.2 and U.S.S.G. § 2D1.1(b)(16) as requests, rather than objections.

> He did not know where, how or to whom the cocaine would be distributed. He had no interactions with any other members of the conspiracy, other than Christopher Roybal, and that was due to an intimate familial relationship. The overall drug conspiracy lasted from August 2011 to December 2012, of which Mr. Valencia was only involved from January 2012 and April 2012, and the evidence against him only supports the one unsuccessful and unprofitable transaction.

Sentencing Memorandum at 10. Valencia also asserts that, if the Court concludes that his conduct does not qualify as that of a minimal participant, "then it must surely qualify as a minor participant deserving a reduction of either three (3) or two (2) levels."

Assuming that the Court does not agree that Valencia is entitled to a 4-level minimal participant reduction under U.S.S.G. § 3B1.2, he contends that "he qualifies for an additional two (2) level reduction due to his intimate or familial relationship with Christopher Roybal pursuant to U.S.S.G. § 2D1.1(b)(16)." Sentencing Memorandum at 11. Valencia submits that he was the best friend of Christopher Roybal's late father and that the two best friends had agreed that, should anything ever happen to one, the other would care for his children. See Sentencing Memorandum at 11. According to Valencia, he took on a father-figure role in not only Christopher Roybal's life, but also his brother's life.

> They gathered for birthdays, holidays and even just met for dinner or lunch when either was in town. Christopher sought Mr. Valencia's counsel when dealing with issues with his brother and brought his daughters out to Mr. Valencia's ranch to visit and ride horses. Numerous phone conversations intercepted by the Government support this close familial relationship. It was not a relationship based on criminal activity. In fact, Mr. Valencia was only approached by the unindicted co-conspirator because of this close relationship. Additionally, he received no monetary compensation on this one transaction and had no knowledge of the scope and structure of the enterprise.

Sentencing Memorandum at 11. In sum, Valencia contends that his base level offense should be reduced from 24 to 15 after: (i) a 4-level minimal participant reduction under § 3B1.2(a); (ii) a three-level reduction under § 3E1.1(b) for Valencia's acceptance of responsibility; and (iii) a

two-level familial relationship reduction under § 2D1.1(b)(16).  See Sentencing Memorandum at

11.  According to Valencia, a total offense level of 15 with a criminal history category of I yields

a sentencing range of 18 to 24 months.  See Sentencing Memorandum at 12.

Valencia then asks for a variance pursuant to the § 3553(a) factors, requesting a sentence

of "five (5) years probation with a combination of time served and one year home detention."

Sentencing Memorandum at 12.  Regarding the first § 3553(a) factor -- the offense's nature and

circumstances, and the defendant's history and characteristics -- he asserts:

> Mr. Valencia is a rancher, a devoted family man, and renowned
> professional roper.  At 54 years of age, he spends his days tending to his family's
> ranch, feeding the animals, building fences and caring for his elderly parents.
> When others are in need, he is quick to offer assistance whether it be some kind of
> work on the ranch to make money, help with their own land or animals, or just a
> kind ear to listen to their troubles.  On an independent basis, he is a heavy
> equipment operator who is licensed to work on natural gas lines.  He also sells
> hay, competes in roping competitions and buys and trains horses to supplement
> his income.  All of which has been documented throughout his exemplary pre-
> trial release.  In essence, he is a renaissance cowboy.

Sentencing Memorandum at 4.  Valencia contends that his only prior criminal history was for

driving under the influence, most recently, seventeen years ago.  According to Valencia, he gave

up alcohol soon after his last arrest and that "[t]his federal detention is his first time serving any

extended period of incarceration."  Sentencing Memorandum at 4.  He emphasizes that he lives

next door to his parents and that he is their primary caretaker.  See Sentencing Memorandum at

5.  Valencia also states that "[n]ow that his brother, Marvin, has been diagnosed with ALS, he is

the only one available to drive them to their numerous doctors' appointments, pay their bills and

tend to all of the ranch responsibilities, including the animals."  Sentencing Memorandum at 5.

Moreover, in light of the diagnosis, Valencia contends that he is particularly needed to assist his

parents and to run the ranch upon which the family depends for financial support.  See

Sentencing Memorandum at 5.  Valencia submits evidence of his purportedly good character:

His longtime girlfriend Lydia, adds "[i]n the months leading up to his court, Marty knew he may be taken into custody.  Though he was a full time employee, [he] worked piling wood for his parents, [her] mother, his brother and his God daughter.  Marty also fixed the fences at the family ranch, so that his Dad and Uncle would not have to worry about animals getting hurt on the highway." . . . On top of being the head of his family, Marty Valencia is always there to extend a helping hand to family, friends and those in his community. . . . Last summer he learned that the Little League team in Holman, New Mexico needed their field reseeded so Marty borrowed a tractor and disks and got it done.  When Marie Trigg needed help with her horses, he ". . . brought his trailer loaded with hay all the out to [her] place just out of the goodness of his heart . . . although he had his hands full with his own animals."  And this past winter when Vangie and Cordell Arellano's son needed money," . . . Marty allowed [their] son to go cut wood for [them] at his family's ranch. . . ."

Sentencing Memorandum at 5-6 (brackets in original)(citations omitted).  According to Valencia, the conduct to which he has pled guilty is out of character for him.  <u>See</u> Sentencing Memorandum at 6.  Valencia contends that an unindicted co-conspirator who he knew was close to C. Roybal, and had dealings with C. Roybal in the past but owed him money, approached him.  <u>See</u> Sentencing Memorandum at 6.  Valencia states that "[h]e asked Marty if he would be the go-between in the deal and not let Roybal know the cocaine was coming from him."  Sentencing Memorandum at 6.  The co-conspirator informed Valencia that he "desperately needed the money and also agreed to split the profits."  Sentencing Memorandum at 6.  Valencia maintains that he did not know the original supplier of the cocaine and that he had no connection to the supplier of cocaine before this proposition.  <u>See</u> Sentencing Memorandum at 6.  According to Valencia, when the cocaine ended up being low quality, he never spoke to the co-conspirator again.  <u>See</u> Sentencing Memorandum at 6.  Moreover, Valencia asserts that the crux of the United States' evidence comes from telephone calls on April 21, 2012.  <u>See</u> Sentencing Memorandum at 6.  Valencia argues that, even during the calls that day, he repeatedly told C. Roybal that he would need to return his call, because he was busy loading hay and building a fence.  <u>See</u> Sentencing Memorandum at 6.  In sum, according to Valencia, "[i]t is further evident

from the time span between the calls, that Mr. Valencia was not a main whose primary focus or job was distributing cocaine."  Sentencing Memorandum at 6.

Valencia next turns to the second § 3553(a) factor -- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.  See Sentencing Memorandum at 6.  Valencia asserts that a sentence of five-years probation with a combination of time served imprisonment and a year of home detention is sufficient, but not greater than necessary, to reflect the offense's seriousness and to promote respect for the law.  See Sentencing Memorandum at 7.  Valencia maintains that, as a result of pleading guilty to the charged offense, he will always be a convicted felon, that he has "**never** been incarcerated before"[8] this incident, and that any time in custody is and has been excruciating punishment for him.  Sentencing Memorandum at 7 (bold in original).  In sum, Valencia argues that his federal detention has "certainly promoted his respect for the law and reflected the seriousness of the offense."  Sentencing Memorandum at 7.

Valencia next addresses the need under § 3553(a) for the sentence to afford adequate deterrence to criminal conduct and the need for the sentence imposed to protect the public from the defendant's further crimes.  See Sentencing Memorandum at 7-8.  Valencia argues that a sentence of probation with time served in custody and one year of home detention with a felony conviction is adequate deterrence.  See Sentencing Memorandum at 7.  Valencia contends that "the time [he] has already spent in prison has taught him that it is not a place he would ever want

---

[8]Regarding whether Valencia has ever been incarcerated before, the Sentencing Memorandum makes two conflicting statements.  First, on page 4 of Valencia's Sentencing Memorandum, he states that "[t]his federal detention is his first time serving any extended period of incarceration."  Sentencing Memorandum at 4 (emphasis added).  Later, on page 7 of Valencia's Sentencing Memorandum, however, he states that he has "**never** been incarcerated before."  Sentencing Memorandum at 7 (bold in original).  The Court notes that there is a difference between never being incarcerated and never being incarcerated for an extended period of time.

to return."  Sentencing Memorandum at 7.  Valencia maintains that he has had to admit the conviction to friends and family, particularly in Las Vegas, New Mexico, where his family is well respected.  See Sentencing Memorandum at 7.  Valencia argues that "[t]he pain and distress this has caused for his family is also the ultimate deterrent for [him]."  Sentencing Memorandum at 7.

> His girlfriend reports a depression being away from her partner with whom she spends every day.  His daughter is suffering from headaches, unable to sleep and distressed with explaining to her four year old daughter why her grandfather is away.  **(See Attachment G. Letter of Alyssa Valencia)**  As his sister Cristella puts it, ". . . Marty has learned from his mistake.  He has never been in trouble before, and the time away from our elderly parents, and his family is hurting him more than any of us can express."  **(See Attachment H. Letter of Cristella Rothwell)**

Sentencing Memorandum at 7-8 (emphasis in original).

Valencia next addresses the need for the sentence imposed to provide the defendant with needed educational or vocational training, or other correctional treatment, in the most effective manner under § 3553(a)(2)(D).  See Sentencing Memorandum at 8-9.  Valencia maintains that he does not need any correctional treatment, although he will benefit from any educational or vocational training provided.  See Sentencing Memorandum at 8.  According to Valencia, he intends to take full advantage of those services.  See Sentencing Memorandum at 8.  Moreover, Valencia states that, if the Court sentences him to probation, Lisa Martinez, General Manager of Enviroworks, is willing to provide him with employment.  See Sentencing Memorandum at 8.  Valencia next emphasizes that not only does Enviroworks seek out his work ethic and skill, but others do as well.  See Sentencing Memorandum at 8.  Valencia contends that, according to John Martinez, owner and operator of Construction 101, Valencia is not only valued as a heavy equipment operator, but also as a caretaker of his family's ninety-acre parcel of land.  See Sentencing Memorandum at 8-9.  Valencia states that Mr. Martinez is also willing to provide

- 22 -

him with employment upon his release from custody.   See Sentencing Memorandum at 8-9.

Finally, according to Valencia, he "has been put in charge of a FEMA[9] supported project to

repair damage caused by the flood on September 13, 2013 along the Roadhouse Ditch (Acquia)."

Sentencing Memorandum at 8.

> He has been charged with removing the 24" culverts and replacing with new 36"
> culverts.   Recently FEMA has delivered the new culverts and per FEMA
> regulations the project needs to be completed by June 2015.   **(See Attachment K,
> FEMA Roundhouse Ditch Paperwork)**  FEMA proclaims that the installation of
> these larger culverts will ensure that ditch recipients receive irrigation waters to
> sustain livestock and irrigate properties.

Sentencing Memorandum at 8-9.  Finally, Valencia addresses § 3553 factors (a)(3) and (a)(4) --

the sentences available and the sentencing range established.  See Sentencing Memorandum at 9.

Valencia argues that he "has been found guilty of one count of conspiracy to distribute cocaine

which carries a mandatory maximum of twenty (20) years imprisonment.  This offense is a Class

C felony, which is eligible for probation; therefore, ANY kind of sentence is available to the

Court."  Sentencing Memorandum at 9 (emphasis in original).

In sum, Valencia states that, "[w]ith a Criminal History Category I and total offense level

21, the applicable guideline range is 37-46 months is the appropriate starting point."  According

to Valencia, however, the parties agreed to reserve the right to argue for further departures and

variances.  Valencia requests that, after taking into account his acceptance of responsibility under

§ 3E1.1(b), reductions under § 3B1.2(a) and § 2D1.1(b)(16), and his request for a variance, the

Court reduce his base offense level from 24 to 15 and sentence him to five-years probation with

---

[9]The Federal Emergency Management Agency is an agency of the United States
Department of Homeland Security tasked with coordinating government-wide emergency and
natural disaster relief efforts.   *About the Agency*, FEMA (Dec. 16, 2015),
http://www.fema.gov/about-agency.

a combination of time served in custody and one year of home detention.  See Sentencing Memorandum at 12.

### 3. **The Second Addendum.**

The USPO filed a second addendum on April 21, 2015, responding to Valencia's Sentencing Memorandum.  See Second Addendum to the PSR, filed April 21, 2015 ("Second Addendum").  The USPO first addresses Valencia's request for a 4-level minimal role adjustment.  See Second Addendum at 1.  The USPO responds that it contacted the case agent for further information and that "[t]he case agent stated there is no information to corroborate the defendant's claim that an unnamed source asked him to pose as a supplier for Christopher Roybal, and that agent believed the claim was unlikely given the other factors in this case." Second Addendum at 1.  The USPO contends that, as noted in the First Addendum, the weight of the controlled substance, Valencia's ongoing relationship with C. Roybal, and his "knowledge of the extent of the conspiracy did not suggest this was the first or only time the defendant distributed cocaine."  Second Addendum at 1.  The USPO maintains that, for these reasons, there is not sufficient information available to warrant applying a mitigating -- or aggravating -- role adjustment, and that the information will remain as written.  See Second Addendum at 1.

The USPO next turns to Valencia's "belief that the defendant should receive a mitigating role adjustment . . . [and that] the defendant should receive an additional two level reduction from the base offense level, pursuant to U.S.S.G. 2D1.1(b)(16)."  Second Addendum at 1.  The USPO "maintains that no role adjustment is warranted," and, "[t]herefore, the defendant is ineligible for a reduction pursuant to U.S.S.G. 2D1.1(b)(16)."  Second Addendum at 1.  The USPO asserts that, even if a minimal role adjustment is warranted in Valencia's case, Valencia would not qualify for the additional 2-level reduction:

> In order to qualify for the reduction, the defendant must have been motivated by an intimate or familial relationship, did not receive any monetary compensation, and the defendant minimal knowledge of the scope and structure of the enterprise. However, the case agent stated the defendant was aware of detailed factors about drug amounts and prices, indicating he did not have minimal knowledge of the conspiracy. For these reasons, the Probation Office believes the additional two level reduction is not warranted.

Second Addendum at 1-2.

### 4.    The Response.

The United States responded to Valencia's Sentencing Memorandum on April 20, 2015. See Sealed Response to Defendant Manuel Valencia's Sentencing Memorandum and Motion for Variance, filed April 20, 2015 (Doc. 852)("Response"). After outlining the facts surrounding the case, the United States argues that an analysis of the § 3553(a) factors "dictates that the appropriate sentence is one within the advisory guideline range of 37 to 46 months." Response at 8. Regarding the nature and circumstances of the offense, the United States asserts that there is nothing about the nature and circumstances of Valencia's offense that would warrant a variance below the guidelines range. See Response at 8. The United States argues that the telephone calls outlined in its Response prove that Valencia distributed one kilogram of cocaine to C. Roybal, who then further distributed the cocaine to John Doe. See Response at 8. According to the United States, over the course of the wiretaps on C. Roybal's telephones, FBI agents identified Valencia as one of C. Roybal's suppliers of cocaine. See Response at 8-9.

> As discussed herein, the primary evidence against the defendant relates to a series of calls on April 21, 2012, and a follow-up call on August 26, 2012. These calls demonstrate that Roybal received a complaint related to the quality of a particular kilogram of cocaine that Roybal had sold to John Doe. Roybal then alerted the source of this cocaine -- that being the defendant. The defendant and Roybal then discussed the options related to the poor-quality cocaine. Based on the communications intercepted, John Doe kept the cocaine, and the defendant and Roybal discussed the defendant paying Roybal back some money to make up for the quality and weight issues.

Response at 9.   The United States concludes that the nature of this offense is therefore distribution of cocaine, and the circumstances of the offense are C. Roybal going to his source -- Valencia -- when confronted with an issue related to the quality of the cocaine provided.   See Response at 9.  Moreover, the United States maintains that "there is simply nothing about the nature and circumstances of this case that warrant a sentence below the advisory guideline range."  Response at 9.

The United States next addresses what it asserts is "the primary basis for the defendant's requested downward variance" -- his history and characteristics.   Response at 9.   While acknowledging that Valencia may be a "renaissance cowboy," with hobbies, interests, and obligations, it asserts that "he is also a drug dealer who, at a minimum, distributed a kilogram of cocaine to Roybal."  Response at 9-10.  The United States argues that "the content and context of the intercepted communications disprove the defendant's claim that this drug transaction was an isolated act done to help out some unidentified third party."  Response at 10.  According to the United States, Valencia's very own words directly refute his presentation of his role in the offense conduct, and that conversations between C. Roybal and Valencia demonstrate that Valencia is "a highly experienced drug dealer who is well-versed in the drug business."  Response at 10.

> With respect to these communications reflecting someone who is very well-versed in dealing drugs, the Court need only look to the initial exchange when Roybal spoke with the defendant about quality issues.  In this conversation, the defendant and Roybal flawlessly engaged in a heavily-coded conversation about the cocaine.  Instead of talking about "the cocaine being of poor quality," Roybal and the defendant discussed how "the bike" is not "running" well.  Of particular note is the defendant's response, "The problem is when I run to bike and get good, good, good, you know what I mean.  I didn't run it that much, but you know what I mean?"  This demonstrates that the defendant was able to speak in code with ease, which is undoubtedly a skill learned over many years.  Moreover, by and through his response, the defendant communicated his intricate

knowledge and experience with cocaine generally, and specifically with respect to
the cocaine provided to Roybal (who then provided it to John Doe).

Response at 10.  The United States also states that, once John Doe confirmed that additional

ounces of cocaine had the same quality issues, C. Roybal called Valencia, and when Valencia

returned the call, C. Roybal did not need to explain to Valencia the significance of the "'bike'

(cocaine) 'not running well' (losing too much product)."  Response at 10-11.  The United States

maintains that, "[i]f this really was the defendant's first and only rodeo, so to speak, Roybal

would have had to spend time explaining to the defendant the quality issues John Doe

encountered."  Response at 11.  Further, when suggesting that C. Roybal and Valencia let John

Doe keep the cocaine at a discount, C. Roybal stated: "So next time you just help out for free, for

fun."  Response at 11.  The United States argues that this undermines Valencia's assertion that

this was "aberrant and isolated conduct on" his behalf.  Response at 11.

The United States next focuses on Valencia's argument that this cocaine deal was an

isolated incident.  See Response at 11.  The United States argues that, in addition to the evidence

gathered in the case, the Court can rely on common sense to reject Valencia's argument.  See

Response at 11.  The United States explains:

> If a person (this unnamed, unidentified drug dealer in the defendant's
> memorandum) had drugs that he or she needed to unload, it seems unlikely that
> they would funnel kilogram quantities of cocaine through an otherwise law-
> abiding citizen.  It is particularly unlikely in this case, when the amount of drugs
> at issue were worth approximately $26,000.  The fact that the defendant had close
> family ties to Roybal does nothing to advance his argument.  Part of Roybal's
> modus operandi was to use those that were closest to him to further his drug-
> trafficking activities -- from his uncle (co-defendant George Roybal), to his
> cousins (co-defendants Jonathon Ulibarri, Brandy Lucero, and Kristen Lucero), to
> his girlfriend (co-defendant Michelle Johnson).

Response at 11-12.  The United States emphasizes that over the course of the investigation and

using numerous investigative techniques, including wiretaps, they identified three different

telephone numbers for Valencia.  See Response at 12.  The United States contends that it is common practice for drug dealers to maintain multiple telephones and to change those numbers to avoid police detection.  See Response at 12.  Moreover, the United States maintains that there is an alternative explanation for Valencia's lack of criminal history -- "he is a highly-skilled and discreet drug trafficker who, up until now, managed to not get caught."  Response at 12.  The United States contends that Valencia's assertion that he did not know to whom the drugs would be distributed nor did he have any interactions with other members of the conspiracy does not support his argument that he is not a well-established drug dealer.  See Response at 12.  According to the United States, "[s]omeone of the defendant's high caliber in the drug world does not fraternize with lower level distributors, such as John Doe,"  Response at 12, and "by limiting his contact to Roybal, [Valencia] attempted to avoid police detection,"  Response at 12-13.

Finally, the United States asserts that just because Valencia has a good reputation in his hometown of Las Vegas, and is a good son and partner, does not mean that he is not also a high-level drug dealer.  See Response at 13.  The United States further explains:

> Thus, while the defendant has provided the Court with a good deal of information about his family and community ties, the primary characteristic that should drive this Court's evaluation of this Section 3553(a) factor is whether the defendant is the stand-up, law-abiding cowboy he portrays himself to be, or whether he is a highly experienced drug trafficker, well versed in the business of dealing drug. An analysis of the evidence in this case -- from the larger context of this investigation to defendant's own words contained in the intercepted calls to the defendant maintaining numerous telephones -- should compel the Court to conclude the latter.

Response at 14.  In sum, the United States contends that the primary basis for Valencia's request for a downward variance is his history and characteristics.  See Response at 14.  The United States asks the Court to deny Valencia's request given the obvious conclusion that Valencia is a

"well versed drug dealer, as evidenced by his role in the instant offense. . . ."  See Response at 14.

The United States next focuses on the need for the sentence imposed to reflect the offense's seriousness, promote respect for the law, provide just punishment, provide adequate deterrence, and protect the public from the defendant's further crimes.  See Response at 14.  The United States contends that Valencia's request for something below the guideline range would not reflect the seriousness of the offense of Conspiracy to Distribute Cocaine, nor would it promote respect for the law.  According to the United States, Valencia's "ease with speaking in code, his use of multiple cell phones, and his familiarity with the drug trade, all suggest that the defendant is a well-versed drug trafficker."  Response at 14.  In sum, the United States maintains that a sentence within the guideline range is required to provide adequate deterrence and to protect the public from Valencia's further crimes.  See Response at 14.  The United States next considers "the sentencing range established by the United States Sentencing Commission for the applicable category of offense committed by the applicable category of defendant."  Response at 14.  The United States notes that the Commission has set the guideline range in this case at 37 to 46 months, which the Court should consider in determining Valencia's sentence.  See Response at 15.

Last, the United States addresses the final § 3553(a) factor -- the need to avoid unwarranted sentencing disparities among defendants who have committed similar crimes.  See Response at 15.  The United States contends that a sentence within the guideline range is the best approach to prevent unwarranted sentencing disparities between similarly situated defendants. See Response at 15.  The United States argues:

> To give the defendant his requested sentence of less than the applicable guideline range would indeed create an undue disparity between himself and others in

indistinguishable situations. Here, the evidence that the defendant conspired with Roybal to distribute a kilogram of cocaine is overwhelming. To vary downward from other in a similar circumstance would create unwarranted disparity. This is particularly true in a case involving numerous co-defendant [sic] who have or will also be coming before this Court for sentencing.

The primary thrust of the defendant's leniency request is that he lacks recent criminal history. This has already been taken into account by his assignment to Criminal History Category I. If the defendant is entitled to a variance from the advisory guideline range based on the reasons that he has provided, a larger number of defendants would also qualify for variances of indeterminate lengths and the guidelines would cease to ensure uniformity between similarly situated defendants.

Response at 15. In sum, the United States requests that the Court impose a sentence within the advisory guideline range of 37 to 46 months and argues that no variance from the guideline range is warranted. See Response at 15-16.

### 5.   The Reply.

Valencia did not file a reply to the United States' Response.

### 6.   The Sentencing Hearing.

The Court held a sentencing hearing on April 21, 2015. See April Tr. at 1. The Court first confirmed that Valencia had reviewed the PSR, the First Addendum, and the Second Addendum. See April Tr. at 2:20-3:17 (Court, McKeivier, Valencia).

THE COURT: Mr. Valencia, have you reviewed the presentence report addendum and the second addendum to the presentence report that probation has prepared? Have you reviewed those three documents?

THE DEFENDANT: Yes.

THE COURT: And Ms. McKeivier, have you reviewed those three documents with Mr. Valencia?

MS. MCKEIVIER: Actually, Your Honor I didn't have a chance to review the second addendum but I think we're ready to proceed because there is not much difference in the third one.

THE COURT: Take a moment.  I know you probably have an objection to it but just make sure he is familiar with it.

MS. MCKEIVIER: Okay.  Your Honor.  I'm sorry.  We're ready.

THE COURT: Have you now had a chance to l[oo]k at that second addendum, Mr. Valencia?

THE DEFENDANT: Yes, sir.

THE COURT: And you've now been able now, Ms. McKeivier, to review the PSR and the first addendum and the second addendum with Mr. Valencia?

MS. MCKEIVIER: Yes, Your honor.

April Tr. at 2:20-3:17 (Court, McKeivier, Valencia).

The Court then moved to Valencia's request for a 4-level minimal role reduction under

U.S.S.G. § 3B1.2(a).  See April Tr. at 3:24-6:18 (Court, McKeivier).  Valencia emphasized that

the briefing thoroughly set forth his argument, but that he would like to respond to the USPO's

position and the case agent's analysis.  See April Tr. at 4:7-12 (McKeivier).  Valencia explained:

> According to probation, the case agent was interviewed and stated that there was no information to corroborate my client's claim that an unknown source asked him to supply Christopher Roybal.  And I take issue with this, because actually, my client did name the source.  He knew him as Big Joe.  And there is evidence to support the fact that Big Joe exists because it's within the Government's evidence in a call on 4/19/2012 between Christopher Roybal and Big Joe, a conversation that is basically summarized as Big Joe saying hey I need money I'm really hurting and Christopher Roybal says call Marty, he's been giving work to my brother, Nick.  So I really take issue with the case agent stating that there is no information to corroborate my client's claim, because clearly there is information corroborating that a Big Joe existed.  That he had connections with Christopher Roybal.

April Tr. at 4:12-5:4 (McKeivier).  Valencia maintained that, under U.S.S.G. § 3B1.2, he is

entitled to a minimal participation role adjustment, because he conducted only one transaction in

a conspiracy that involved hundreds of kilograms of cocaine, marijuana, and money laundering.

See April Tr. at 5:5-16 (McKeivier).  Valencia further asserted that, according to § 2D1.1,

application note 27(c), the purity level of the drugs involved is indicative of the defendant's role

or position in the chain of distribution.  See April Tr. at 5:17-6:7 (McKeivier).  According to

Valencia, the call on which the United States bases its case against him is a complaint about the

quality of the cocaine that Valencia distributed.  See April Tr. at 6:2-7 (McKeivier).  Valencia

concluded:

> Your Honor, with the one transaction in a one and a half year investigation with
> multiple roving wiretaps, wiretaps, controlled buys and et cetera, we believe that
> Mr. Valencia's one transaction qualifies him for the the minimal participation role
> and minus four reduction.  If the Court disagrees with us, then we certainly would
> present that he at least qualifies for a minor participant role for minus 3 or minus
> 2, based on these facts.

April Tr. at 4:12-5:4 (McKeivier).

Valencia next asserted that, if the Court agrees that he should receive a 4-level minimal

role reduction, he would be eligible for another 2-level reduction under U.S.S.G. § 2D1.1(b)(16),

because Valencia was asked to distribute this kilogram of cocaine given his close relationship

with C. Roybal.  See April Tr. at 6:19-9:16 (McKeivier).  Valencia clarified that he is not

arguing that C. Roybal used him, but rather that the unindicted co-conspirator, Big Joe,

approached Valencia, because he was aware of the relationship that Valencia had with C.

Roybal.  See April Tr. at 7:6-12 (McKeivier).  Valencia explained that his relationship with C.

Roybal was not based solely on this criminal activity, but on him knowing C. Roybal for his

whole life.  See April Tr. at 7:15-18 (McKeivier).  Valencia maintained that he was C. Roybal's

father's best friend and that they had promised each other to care for each other's children should

one of them pass away.  See April Tr. at 7:18-8:1 (McKeivier).  Valencia asserted that there is no

evidence that his ongoing relationship with C. Roybal was solely based on drug transactions.

See April Tr. at 9:1-5 (McKeivier).  In sum, Valencia asked the Court to "determine that Mr.

Valencia is not only a minimal participant in this conspiracy but also qualified under

2D1.1(b)(16) that he got involved based on his familial or intimate relationship with Christopher Roybal." April Tr. at 9:12-16 (McKeivier).

The Court responded, expressing some skepticism regarding Valencia's request for either role adjustments. See April Tr. at 9:21-10:2 (Court). The Court stated that it is unusual that a source would be asking for a minimal or a minor role adjustment. See April Tr. at 9:21-10:2 (Court). The Court explained that typically it is a defendant on the other end of the hierarchy -- such as a courier or girlfriend -- that asks for a minimal or minor role adjustment, and not somebody at the top of the chain. See April Tr. at 9:21-10:2 (Court). Valencia maintained that the guideline does not preclude its application in this case. See April Tr. at 10:3-8 (McKeivier). Valencia further asserted:

> While he can be considered a supplier, I would more aptly characterize him as a middleman supplier came to him because he didn't have the relationship with Christopher Roybal to make the deal, asked Mr. Valencia to step in. He did it. It was an exchange of two things going across Mr. Valencia. So I would call him more of a middleman. But I understand that this can be classified as a distributor or a supplier. Although like I said, he was just kind of the conduit.

April Tr. at 10:9-19 (McKeivier).

The Court then asked Valencia whether he had anything else to say on the objections. See April Tr. at 10:20-21 (Court). Valencia stated that he objects "to the agent's characterization being added in the additional information." April Tr. at 10:25-11:2 (McKeivier). Valencia contended that there was nothing to support Valencia's knowledge and the extent of the conspiracy and that the agent mischaracterized Valencia's entire relationship with C. Roybal. See April Tr. at 10:3-7 (McKeivier). Specifically, Valencia asked "that his entire statement be stricken from that additional information where it starts with the agent stated the defendant's ongoing relationship." See April Tr. at 11:8-11 (McKeivier). Valencia also took issue with response number two in the second addendum, which according to Valencia, stated that "the

defendant was aware of detailed factors about drug amounts and prices, indicating he did not have minimal knowledge of the conspiracy." See April Tr. at 11:11-16 (McKeivier).  According to Valencia, he "never gave information regarding pricing other than what the kilo he used was purchased for and what money exchanged there."  April Tr. at 11:17-19 (McKeivier).  Valencia further asserted that, "knowing drug amounts does not necessarily mean understanding that how many ounces are in a kilogram or how many grams are in an ounce, doesn't necessarily mean you only have knowledge of drugs."  April Tr. at 11:21-25 (McKeivier).  The Court then responded to Valencia's issues with the two addendums, and agreed on several adjustments to reflect Valencia's views:

> THE COURT: Well, what if I -- to deal with your objections to these, what if I put a semi colon after let's take the addendum first, the sentence that you object to.
>
> MS. MCKEIVIER: In the first addendum, Your Honor?
>
> THE COURT: Yes.  Just put a semi colon after the defendant distributed cocaine and just put the defendant disagrees with the agent's conclusions.  Would that be acceptable to deal with that?  I mean the agent is stating whatever he states.  But add that you disagree with that conclusion.
>
> MS. MCKEIVIER: I disagree with the inclusion based on the evidence, but.
>
> THE COURT: And I can add that.  The defendant objects, the defendant disagrees with the agent's conclusion based on the evidence.
>
> MS. MCKEIVIER: That's fine, Your Honor.
>
> THE COURT: And then on the one that let's see fi I could do something similar on the second deny dumb.  [sic] Maybe here I could put a semi colon and say the defendant.
>
> MS. MCKEIVIER: Are you on response number one where he states there is no information to corroborate the defendant's claim that the unnamed source.
>
> THE COURT: I'm now on the second addendum on the second page where it says the case agent was aware of detailed factors.  I can put the defendant disagrees with that characterization of his debriefing about the detail he was able

- 34 -

to give on amounts and prices.  Would that change to a second addendum deal with you objection.

MS. MCKEIVIER: Yes, Your Honor that's fine.

THE COURT: All right.  Anything else Ms. McKeivier.

MS. MCKEIVIER: Well I'd like to go back to response Number 1 where he states that there is no information to corroborate the defendant's claim that an unnamed source because my client did name the source and there are phone calls with that particular individual between Christopher Roybal and they do state my client's name in there, so I think that's completely accurate.

THE COURT: All right.  Let me add a sentence after that sentence saying the defendant maintains that is the name Big Joe is that what you called him, Big Joe.

MS. LONG: Yes, Big Joe, Your Honor.

THE COURT: Big Joe was his source.  Would adding that sentence work for you Ms. McKeivier.

MS. MCKEIVIER: I'm sorry I apologize.

THE COURT: Add a sentence after that where the case patting stated just put the defendant maintains that Big Joe was his source.

MS. MCKEIVIER: Yes, that's fine.

MS. MCKEIVIER: Could we add that there was also evidence of Big Joe in the conspiracy or in the Government's evidence.

THE COURT: And that there was evidence of Big Joe in the evidence and in the conspiracy, does that work.

MS. MCKEIVIER: Yes, Your Honor that's fine.

April Tr. at 12:18-14:2 (Court, Long, McKeivier).

The United States then took up argument on the sentencing, beginning by responding to Valencia's request for reductions under U.S.S.G. § 3B1.2 and § 2D1.1(b)(16).  See April Tr. at 15:12-25 (Court, Long).  The United States agreed with the USPO that neither adjustment is appropriate in Valencia's case.  See April Tr. at 15:15-17 (Long).  The United States noted that

the Court has correctly noted that there is a tension underlying Valencia's request for a minimal

role adjustment given that Valencia was the source of the cocaine supply in this case.  See April

Tr. at 15:18-23 (Long).  The United States asserted that the evidence in this case supports the

agent's comments provided to the USPO and that the United States fully expressed its views in

its Response.  See April Tr. at 15:23-16:3 (Long).  Moreover, the United States contended that

Valencia was lucky, because, in most of the intercepted calls, C. Roybal and Valencia were

discussing meeting in person.  See April Tr. at 16:11-21 (Long).  According to the United States,

Valencia "basically slipped up" in the calls that the United States highlighted in its Response.

April Tr. at 16:22-17:1 (Long).

> When he did talk about the bike, which everyone agrees means cocaine.  And he
> talked about the bike not running well and there is reference to 24 and 25.  What's
> most important for this Court is to keep in mind is the defendant easily slipped
> into very disguised coded drug talk.  This was not a conversation where there was
> any difficulty of this defendant to understand precisely what Mr. Roybal's
> concerns were, what the issues were, how they were going to manage those
> issues, what the options were to resolve the quality complaints advanced by the
> person below Mr. Roybal.

April Tr. at 17:2-14 (Long).  The United States asserted that this evidence presents Valencia as

one who was a source of cocaine supply in this case and that this evidence undermines his

contention that this crime was "an isolated incident, aberrant conduct that really all you have in

this case is a man who is just a quote middleman."  April Tr. at 17:14-24 (Long).  Moreover, the

United States maintained that Valencia's characterization of his role in the conspiracy disregards

the evidence underlying these telephone calls and the various other calls intercepted.  See April

Tr. at 17:2-14 (Long).  The United States also took issue with Valencia's assertion "that [he]

never spoke with anyone else in the conspiracy [and] that he knows no one else in this

conspiracy."  April Tr. at 17:24-18:2 (Long).  The United States contends that it intercepted a

call between Roybal and Valencia in which Roybal directs Valencia to meet with Brandy Lucero

for Lucero to collect money from Valencia, and that the meeting presumably took place.  See April Tr. at 18:3-15 (Long).

The United States next addressed Valencia's request for a reduction under § 2D1.1(b)(16).  See April Tr. at 18-16-19 (Long).  The United States contended that, under § 2D1.1(b)(16), a defendant must satisfy three prongs: (i) that an intimate or familial relationship motivated the defendant to commit the offense; (ii) that he or she did not receive any money or compensation; and (iii) that he or she had minimum natural knowledge of the enterprise's scope and structure.  See April Tr. at 18:20-19:1 (Long).  According to the United States, while it concedes that under prong one Valencia likely had a relationship with C. Roybal outside of drug trafficking, it is not clear that this family relationship "motivated" Valencia to commit the offense.  See April Tr. at 19:1-20:17 (Long).  The United States argued that Valencia's motivation was to traffic drugs throughout New Mexico and that C. Roybal being the son of one of his good friends had nothing to do with his motivation.  See April Tr. at 19:1-19:23 (Long).  The United States also argued that Valencia fails on prongs two and three.  See April Tr. at 19:23-20:20 (Long).  Regarding monetary compensation, the United States asserted that, even if he did not realize any profit on this particular kilogram transaction, not all drug dealers make a profit on every single transaction.  See April Tr. at 19:23-20:7 (Long).  Finally, regarding Valencia's minimal knowledge of the enterprise's scope and structure, the United States pointed to Valencia's contact with Lucero and that, in the intercepted telephone calls, he expressed and acknowledged an understanding of how things worked.  See April Tr. at 20:13-21:24 (Long).  The United States also took issue with Valencia's contention that he was merely a conduit for Big Joe to conduct business with C. Roybal:

> So this law abiding citizen who has really no theory involvement in this case he agrees okay, yes, I will go to Mr. Roybal and I will deliver a kilo of

cocaine.  That is just not believable on so many levels.  And when you look at it in terms of how this fits into the overall scheme and where the defendant falls, you know, really what we're left with is a man who is trying to come up with an explanation of how is it that I provided a kilo of cocaine to the defendant and still accept responsibility for that and admit to that, but try to get away with as much leniency as possible.  So you know really, the identity of this supplier is irrelevant. . . . If Big Joe has kilo quantities of cocaine, why is it that he is so desperate to the Christopher Roybal to the unload that coin.  Why would he go to a man with no drug trafficking experience who is a law-abiding citizen who sells hay, does rodeo, in roping competitions.  It's not like Christopher Roybal is the -- is the only cocaine distributor in New Mexico or in Las Vegas, New Mexico.  It's a small town.  But there is [sic] a lot of people pushing a lot of weight up up [sic] there.

April Tr. at 21:24-22:23 (Long).

The Court then provided Valencia with the last word on his objections.  See April Tr. at 23:3-5 (Court).  First, Valencia contended that C. Roybal used all of the coded language in the telephone calls and that, although Valencia knows other members of C. Roybal's family, they have been friends since he was a teenager.  See April Tr. at 23:9-24:1 (McKeivier).  Valencia also disputed the United States' characterization of him "as the most skilled drug dealer ever." April Tr. at 24:15-24 (McKeivier).  According to Valencia, the United States wants the Court to believe that Valencia "managed to avoid a year-and-a-half investigation with roving wiretaps, wiretaps, CIs, undercover buys, yet on the other hand they want you to believe that he was so [naïve] and ignorant on April 21 that he just gave them everything they needed in a series . . . of phone calls."  April Tr. at 24:15-24 (McKeivier).  Valencia also took issue with the United States' presentation how quickly after C. Roybal called Valencia about quality problems that Valencia returned the call.  See April Tr. at 26:3-27:11 (McKeivier).  Valencia asserted that it was much longer than fifteen minutes.  See April Tr. at 26:3-27:11 (McKeivier).  Valencia contended that the United States asserted that he had three telephones, but did not disclose that the other telephones did not "pop up" until around the time of the April 21st transaction.  April

Tr. at 27:11-20 (McKeivier).  Valencia argued that the United States also never intercepted any

calls on the third telephone.  See April Tr. at 27:11-20 (McKeivier).  In conclusion, Valencia

asserted:

> They would ask you to adopt their version based on the backdrop of the
> investigation of Christopher Roybal.  Although they have no evidence of Mr.
> Valencia's involvement or knowledge of any of Mr. Roybal's dealings other than
> the one transaction, which he's admitted to participating in.  The evidence against
> Mr. Valencia speaks for itself.  One transaction, phone calls on April 21, support
> is that one transaction of one kilogram of cocaine.  The evidence against Mr.
> Roybal is irrelevant to his position in this scheme and to what he did.  But the
> Government continues to draw your attention to that overall scope.
>      And with that, Your honor, we believe that a sentence of probation with
> time served and a year of home detention is absolutely appropriate for this
> defendant and it's sufficient but not greater than necessary to achieve the goals.

April Tr. at 28:6-24 (McKeivier).

The Court then overruled Valencia's two objections before to imposing the sentence.  See

April Tr. at 28:25-30:24 (Court).  The Court concluded that Valencia "was someone that was

more experienced with drug trafficking than this single incident."  April Tr. at 29:5-7 (Court).

The Court emphasized the importance of sources in drug trafficking.  See April Tr. at 29:7-12

(Court).  The Court explained that it could not say that a source should never get a minor or

minimal role adjustment, but that such defendants "have a more difficult task [than] ten people at

the other end of the chain who are in the distribution end and maybe couriers, answering phones

and [have a] facility . . . individual transactions."  April Tr. at 29:12-18 (Court).  The Court

indicated that Valencia also having a source, be it Big Joe or someone else, did not undercut the

fact that he was ultimately a source for C. Roybal, a major drug distributor in New Mexico.  See

April Tr. at 29:18-24 (Court).  The Court further explained:

> I don't believe that I can soundly find on the evidence before the Court Mr.
> Valencia is plainly among the least culpable in this drug organization.  We've
> already sentenced five or 6, and it happens to [b]e that the people that I've
> sentenced so far in this 19 person organization, he's the most culpable of the

people I've sentenced so far.  I'm sure there is going to be more down the road.
So I don't think he qualifies for a minimal role adjustment.  I have studied the
organization as I've begun to get fairly familiar with the guts of this PSR, and I
also do not believe I can find by a preponderance of the evidence that he's less
culpable than most other participants in the conspiracy.

April Tr. at 29:24-30:12 (Court).

In sum, the Court overruled "the two objections for minimal and minor role adjustments

[under § 3B1.2]" and concluded "that makes him ineligible for the downward departure [under

U.S.S.G. 2D1.1(b)(16)]."  April Tr. at 30:13-17 (Court).  The United States then moved for  "a

third level adjustment downward for acceptance of responsibility," and Valencia did not object.

April Tr. at 30:20-31:9 (Court, McKeivier).  The Court then stated that "with the adjustment

downward for acceptance of responsibility the offense level is 21 and the criminal history

category is one and the guideline imprisonment range is 37 to 46 months."  April Tr. at 31:5-9

(Court).  The Court then asked Valencia if he wished to say anything further on his request for a

variance from the guideline sentence.  See April Tr. at 31:13-16 (Court).  Valencia responded:

"No, Your Honor.  I think we covered it in the memorandum and the arguments we've made

today, with regard to Mr. Valencia."  April Tr. at 31:17-19 (McKeivier).  Valencia stated,

however, that the character letters speak for themselves, and that they are consistent with him

being a family man, rancher, and hard worker.  See April Tr. at 31:22-32:3 (McKeivier).

Valencia asserted that, while the Court might not think that he qualifies for a minimal participant

reduction, "he still qualifies for a variance and should be sentenced to probation with conditions

of time served and one year at home detention and with that Your Honor we'll submit."  April

Tr. at 32:3-8 (McKeivier).

The Court then asked some questions about Valencia's financial condition:

THE COURT: Let me ask you some questions about, I'm trying to get an idea of
his financial picture.  I think I understand the ranch.  But there seemed to be some

- 40 -

confusion about the horses T [sic] the value of the of the horses and how many horses.  How many horses does Mr. Valencia have?

MS. MCKEIVIER: He has eight horses.

THE COURT: And are all those horses valued in his opinion in the 15 for 20,000 range?

MS. MCKEIVIER: Yes, in his knowledge and opinion, yes.  I'm sure he had horses of higher value which is what his son was basing that on but at this time they're not and after his absence many of the animals have started to deteriorate even further.

THE COURT: All right.  Anything else.

MS. MCKEIVIER: If you have other questions regarding his finances we're happy to explain them.

THE COURT: I was adding them up in my mind.  It looks like he's got the net worth that's stated in paragraph 105 and then eight horses, if I take the low end of 15,000, he's got about 120,000 in horses does that sound about right.

MS. MCKEIVIER: I would trust your math.

THE COURT: All right.  Anything further?

MS. MCKEIVIER: No, Your Honor.

April Tr. at 32:9-33:8 (Court, McKeivier).  Valencia then accepted responsibility for engaging in the conspiracy to distribute cocaine, though he did not otherwise make a statement.  See April Tr. at 32:9-33:8 (Court, McKeivier).

The United States briefly re-asserted its arguments against a variance in Valencia's case and in favor of a guideline sentence, and the Court then imposed the sentence.  See April Tr. at 34:4-38:8 (Court, Long).  The Court adopted the PSR's factual findings as its own, other than the two changes that were made to the addendums.  See April Tr. at 38:13-18 (Court).  The Court also stated that it had considered the sentencing guideline applications to the presentence report, and having overruled Valencia's objections, it would adopt those as its own as well.  See April

Tr. at 38:18-22 (Court).  The Court explained that, with an offense level of 21 and a criminal history category of I, the guideline imprisonment range is 37 to 46 months.  See April Tr. at 38:25-39:3 (Court).  After considering the relevant factors set forth in 18 U.S.C. § 3553(a), the Court then stated the sentence -- a term of imprisonment of 37 months, followed by a three-year term of supervised release.  See April Tr. at 38:25-45:25 (Court).  The Court identified about six factors that put downward pressure on Valencia's sentence: (i)  a large number of character letters were submitted on Valencia's behalf and people think highly of Valencia as an employee, rancher, and member of the greater Las Vegas community; (ii) the need to provide just punishment puts downward pressure on the sentence; (iii) the public needs less protection from Valencia than it needs from someone who the Court is convinced might recidivate or who has a history of violence; (iv) supervised release can go a long way in serving as an alternative to longer imprisonment; (v) the overall desire to have a reasonable sentence puts downward pressure on the sentence; and (vi) the need for the sentence to not be greater than necessary puts downward pressure on the sentence.  See April Tr. at 39:11-40:12 (Court).

The Court noted, however, that there were some factors that put upward pressure on the sentence: (i) this is a serious offense involving large amounts of drugs in a community that is wrestling with cocaine and heroin problems; (ii) the sentence must promote respect for the law; (iii) the need to provide just punishment because of the seriousness of the crime also puts upward pressure on the sentence; (iv) the sentence must afford adequate deterrence at the specific level so that Valencia does not engage in drug activity again, and afford general deterrence to deter people from engaging in this activity; (v) although the Court is less concerned that Valencia might recidivate, the public must be protected from this drug trafficking activity; (vi) the need to avoid unwarranted sentencing disparities among defendants with similar records involving

similar conduct, plus the need to be consistent with other sentences the Court has given to Valencia's co-defendants, puts pressure on the Court to stay within the guidelines range; (vii) the overall desire to have a reasonable sentence puts upward pressure on the sentence; and (viii) the need for the sentence to be sufficient puts upward pressure on the sentence.  See April Tr. at 40:12-41:18 (Court).  In sum, the Court concluded that the factors that counsel for a guideline sentence outweighed the factors that put downward pressure on the sentence.  Accordingly, the Court denied Valencia's request for a variance and sentenced him to a term of imprisonment of 37 months, followed by a three-year term of supervised release.  See April Tr. at 41:18-43:12 (Court).  The Court also levied a fine of $99,801.98, payable at the rate of at least $625.00 per month, explaining:

> The Court has carefully considered the defendant's financial situation. He's done much better than many team [sic] people that come before the Court and I agree with probation that a fine is appropriate here.  Because of the length of sentence he's going to receive [and] the length of the supervised release he's going to receive, he's going to be a considerable burden on the taxpayers.  I calculated one by basically calculating the cost of his incarceration and then also the cost of supervised release for the 37 months of incarceration, and three years of supervised release.  He appears to have the assets to pay it even with the judgment that he's agreed to with the United States and with the special assessment that will be entered.  So the Court is going to require the defendant to pay a fine of 99,801 and '98 cents.  The sum will be paid at the rate of at least 6 25 [sic] per month, pursuant to the plea agreement, the defendant will also pay a money judgment in the amount of 28 thousand dollars.  The defendant will pay a special assessment of $100 economist due immediately.

April Tr. at 45:1-22 (Court).  The Court then asked counsel if "they know of any reason why the sentence should not be imposed as the Court has stated it other than what has been argued to the Court listening."  April Tr. at 45:22-25 (Court).  The parties responded:

> MS. LONG: No, Your Honor, thank you.

> THE COURT: Ms. McKeivier.

> MS. MCKEIVIER: No, your Honor, we would object the fine amount.

April Tr. at 46:1-4 (Court, Long, McKeivier).   The Court then imposed the sentence.  See April

Tr. at 46:5-47:15 (Court).  The Court subsequently made some further comments on its decision

to impose a fine:

> THE COURT: All right.  And I might on the objections on the fine, I did think
> very carefully about it before I came in and wanted to find out the value of the
> horses to try to get a real accurate picture of his financial situation, but I do think I
> agree with probation a fine is appropriate here given the cost that it's going to
> about [sic] to incarcerate and supervise him I think it's appropriate.  All right.
> Let's see.
>
> MS. MCKEIVIER: Turns what was the total amount again I'm sorry I got the 99.
>
> THE COURT: 99,801.98.  That's based on my calculations of $90,3145.89 [sic]
> it's going to take to incarcerate him, and the $thousand 48 $6 and 9 September to
> supervise him [sic] (check).

April Tr. at 47:20-48:9 (Court, McKeivier).

### 7.      The Motion to Reduce Sentence.

Valencia was sentenced on April 21, 2015.  Fourteen days later, on May 5, 2015 and

before the Court entered a judgment, Valencia moved to replace McKeivier with Aarons, his

original counsel in this case, see Motion to Substitute Attorney, filed May 5, 2015 (Doc. 892),

and filed a Motion to Reduce Sentence, see Motion to Reduce Sentence, filed May 5, 2015 (Doc.

893)("Motion to Reduce").  The Court granted Valencia's Motion to Substitute Attorney on May

27, 2015.  See Unopposed Order to Substitute Attorney, filed May 27, 2015 (Doc. 931).  In his

Motion to Reduce Sentence, Valencia first asserts that the "sentencing judge is vested with

'commodious' discretion when considering motions to reduce sentence under Fed. R. Crim. P.

35(b)."  Motion to Reduce at 1 (quoting United States v. Glantz, 884 F.2d 1483, 1487 (1st Cir.

1989)).  According to Valencia, however, "[t]he court's authority to change a fine is not provided

for in Rule 35(b) but is controlled by 18 U.S.C. § 3573 and may be invoked by a petition for

remission under that statutory authority."  Motion to Reduce at 1 (quoting United States v. McMillan, 106 F.3d 322, 325 (10th Cir. 1997)).  Moreover, Valencia asserts that the Court should correct his sentence under these rules, because he was sentenced in an illegal manner in violation of his constitutional right to due process.  See Motion to Reduce at 1-2 (citing Hill v. United States, 368 U.S. 424 (1962)).

Moreover, Valencia contends that there were a variety of problems with the manner in which he was sentenced.  See Motion to Reduce at 1-3.  First, Valencia asserts that he has difficulty reading without assistance, and that he has yet to see the PSR from his California attorney[10] or otherwise.  See Motion to Reduce at 2.  Valencia further explains:

> His counsel failed to inform the court of numerous items in extenuation and mitigation of sentence including the applicability of a downward departure for extraordinary caretaker duties over his elderly parents and a brother with Lou Gehrig's disease, the misstatement of the number and value of horses owned by him as opposed to cared for by him but owned by others which cannot be sold by defendant to pay the fine.  Also, after the single foiled transaction other conspirators broke into his home and battered defendant, demanding money for the poor quality contraband.

Motion to Reduce at 2.  Valencia next argues that his counsel did not:

> present uncontroverted evidence that he was a minor participant and the nature of his familial relationship with the principal defendant by solemn agreement with the co-defendant's now deceased father to take care of co-defendant, or that the numerous conversations were not about drugs but family relationships such as children riding horses, Christmas and holiday dinner arrangements, and other family matters.

Motion to Reduce at 2-3.

Valencia next asserts that his counsel should have objected to the prosecuting attorney's argument that Valencia was "'lucky' not to have any relevant conversation intercepted other than

_____

[10]In referencing his "California attorney," Valencia is referring to Ashli Summer McKeivier -- of the Criminal Defense Group in North Hollywood, California -- who represented him at his April 21, 2015, sentencing hearing.  See PSR at 1.

the one occasion at the end of a nine-month period of surveillance as such unsubstantiated arguments against minor participant role reduction is improper in the absence of evidence." Motion to Reduce at 3.  Valencia further contends that the prosecuting attorney, on information and belief, has "direct knowledge through safety valve interviews of co-defendants and otherwise that in fact only one co-defendant and his uncle ever saw or spoke or even heard of defendant Valencia because he was not 'lucky' but not involved beyond one failed attempt." Motion to Reduce at 3.  Finally, Valencia asserts that the fine imposed in this case, in excess of $99,000, does not bear a relationship "to his single foiled deal involving no transfer of monies." Motion to Reduce at 3.

Valencia states that:

Alternatively, if the court finds no jurisdiction under the foregoing authority, 28 U.S.C. § 2255 gives the prisoner authority to argue that the sentence was imposed in violation of the Constitution or laws of the United States including his right to effective assistance of counsel in reviewing the PSR and including in the sentence memorandum all relevant matters that were discussed by family and defendant.

Motion to Reduce at 3-4.  In conclusion, Valencia asks the Court for the following relief:

A.      Permit defendant a fair opportunity to review the PSR presented to the court, and any amendments, and to comment through counsel upon the PSR including evidence of a downward departures as caretaker, role reduction, and the inappropriateness or abuse of discretion in "setting defendant up for failure" by imposing fines greater than his ability to pay;

B.      In the event the court finds no jurisdiction to consider defendant's motion to reduce sentence, allow him leave to file a petition under 18 U.S.C. § 3573 to reduce the fine imposed and/or 28 U.S.C. § 2255 to review and rebut matters alleged in the PSR and to present matters not previously addressed in a supplemental pleading to this initial motion filed within the two week period; and,

C.      Grant such further relief as justice requires.

Motion to Reduce at 4.

8.      **The Response to Motion to Reduce**.

The United States responded to Valencia's Motion to Reduce Sentence on August 7, 2015.   See United States' Response to Defendant Manuel Valencia's Motion to Reduce Sentence, August 7, 2015 (Doc. 1029)("Response to MTR").   The United States makes essentially two arguments.  Response to MTR at 1-2.  First, the United States asserts that "Rule 35(b) states that the United States may move to reduce a defendant's sentence for substantial assistance in certain circumstances," but that it can "only be invoked by the United States, not the defendant."  Response to MTR at 1 (citing United States v. Blackwell, 81 F.3d 945 (10th Cir. 1996)).   Additionally, according to the United States, 18 U.S.C. § 3573 applies only "[u]pon petition of the Government [that] show[s] that reasonable efforts to collect a fine or assessment are not likely to be effective."  Response to MTR at 2 (quoting 18 U.S.C. § 3573).  The United States contends that, in this case, because there have been no efforts to collect on the fine imposed and the United States has not so petitioned the Court, § 3573 cannot serve as a basis for any relief that Valencia seeks.  See Response to MTR at 2.

Second, the United States asks the Court to reject Valencia's request to treat his motion, in the alternative, as submitted under 28 U.S.C. § 2255 "on the grounds that his former attorney was ineffective by not asserting certain arguments at sentencing or affording the defendant an opportunity to review the Presentence Report."  Response to MTR at 2.  The United States asserts that, while a defendant may submit a petition for habeas corpus to collaterally attack the judgment in this case, "such petitions may only be filed after entry of judgment in a case."  Response to MTR at 2.  According to the United States, here, "no judgment has yet been entered,

so it would be premature to consider a habeas corpus petition."[11]   Response to MTR at 2.   In

conclusion, the United States asks the Court to deny Valencia's motion and proceed to enter

judgment in this case, explaining:

> In essence, the defendant's motion is one asking for another bite at the apple.   The assertions made in his motion are either not supported by the record (for example, the defendant's claim that he was not afforded a chance to review the PSR, which is in direct conflict with the sentencing proceedings before this Court), or not ones that the Court should entertain (i.e. challenging the precise contours of his former attorney's arguments before this Court).   There is nothing raised in the defendant's motion that would warrant this Court to do anything but proceed to enter judgment in this matter.

Response to MTR at 2-3.

### 9.   **The Reply**.

Valencia replied to the United States' response on September 9, 2015.   See Reply to

United States' Response to Defendant Manuel Valencia's Motion to Reduce Sentence, filed

September 9, 2015 (Doc. 1052)("Reply to MTR").   Valencia first focuses on the merits of his

Motion to Reduce Sentence, asserting that he never got a first bite at the apple, and that, at the

sentencing hearing, Valencia's former counsel instructed him "to state yes that he did read a final

amendment so the hearing could proceed as scheduled with counsel who had flown to New

Mexico from California."   Reply to MTR at 1.   According to Valencia, three days after the

sentencing hearing, his former counsel mailed the PSR to him.   See Reply to MTR at 2.

Valencia asserts, moreover, that he is illiterate, and that "he did not receive the PSR until after he

hired substitute counsel and filed his Motion."   Reply to MTR at 2.   Valencia contends that,

because his former counsel never afforded him the opportunity for him to read or have the PSR

read to him, and because his former counsel did not allow Valencia's family to assist him, he

---

[11]No judgment was entered immediately after Valencia's April 21, 2015 sentencing hearing and the Motion to Reduce Sentence was filed fourteen days later on May 5, 2015.

failed, through his former counsel, "to inform the Court of numerous items in extenuation and mitigation of that report and the matters raised at that hearing."  Reply to MTR at 2.

Second, Valencia asserts that the United States admits that he may attack the judgment based on ineffective assistance and that his plea agreement specifically reserved the right to collateral attack on this basis.  See Reply to MTR at 2.  Moreover, Valencia takes issue with the United States' contention that he may do so only after entry of judgment in a case and that, here, judgment has not been entered.  See Reply to MTR at 3.  According to Valencia, subsection (f) of § 2255 does not preclude him from filing his motion before entry of judgment.  See Reply to MTR at 3.  Valencia maintains that subsection (f) of § 2255 "only establishes a deadline for filing the motion, namely one year from '(1) the date on which the judgment of conviction becomes final.'"  Reply to MTR at 3.  Valencia asserts that the United States does not cite to any authority for the proposition that a § 2255 motion filed before entry of judgment is premature and that a court may not consider the petition in affording a defendant due process.  See Reply to MTR at 3.

Finally, Valencia emphasizes that his motion's focus is that he was not afforded the opportunity to review his PSR until after the sentencing hearing and that, therefore, he did not have the opportunity to present "numerous items in extenuation and mitigation."  Reply to MTR at 3.  Valencia thereafter cites to Gardner v. Florida, 430 U.S. 249 (1977), and Townsend v. Burke, 334 U.S. 736 (1948), for the proposition that he "has a due process right to question the procedure leading to the imposition of his sentence" and that due process mandates that a defendant "be given the opportunity to assure the accurate presentation of reliable sentencing information to the district court."  Reply to MTR at 3-4.  According to Valencia, a defendant "may not be sentenced on the basis of 'materially untrue' statements or 'misinformation.'"

Reply to MTR at 3-4.  Valencia further explains: "Congress, for example, has provided in Fed. R. Crim. P. 32(c)(3)(A) that a defendant must be given an opportunity to review a pre-sentence report and provide comment to ensure that the 'report [is] completely accurate in every material respect.'"  Reply to MTR at 4 (quoting H.R. Rep. No. 247, 94th Cong., 1st Sess. 18, reprinted in 1975 U.S.C.C.A. News 674, 690).

### 10.    __The Hearing on the Motion to Reduce Sentence__.

The Court held a hearing on the Motion to Reduce Sentence on September 11, 2015.  See Transcript of Sentencing Hearing (taken April 21, 2015)("Sept. Tr.").  The Court first made a few comments on the MTR.  See Sept. Tr. at 1:20-2:22 (Court).  The Court stated that, based on the briefing, it appeared that there may have been an acknowledgement on Valencia's part that the Court cannot touch the judgment.  See Sept. Tr. at 1:20-2:22 (Court).  The Court expressed that perhaps what Valencia might want the Court to do is to enter a judgment and Valencia could then collaterally attack the judgment under a theory of ineffective assistance of counsel pursuant to 28 U.S.C. § 2255.  See Sept. Tr. at 1:20-2:22 (Court).  The Court also suggested that it might be helpful for the Court to write an opinion explaining its reasoning for imposing a fine of $99,801.98.  See Sept. Tr. at 1:20-2:22 (Court).

Valencia agreed that there is some benefit to the Court writing an opinion.  See Sept. Tr. at 3:3-6 (Aarons).  Valencia also expressed, however, that, although traditionally defendants file a petition under 28 U.S.C. § 2255 after the judgment is entered, he did not think that a final judgment was a prerequisite.  See Sept. Tr. at 3:15-22 (Aarons).  Valencia also explained that what he wants is a resentencing, because he was not afforded an opportunity to look at his PSR, and there were various other problems with his sentencing.  See Sept. Tr. at 3:25-4:8 (Aarons).  Valencia suggested that he would like to discuss these issues in a supplemental or a second

sentencing memorandum.  See Sept. Tr. at 3:25-4:8 (Aarons).  The Court then asked whether Valencia agreed that he would need get the sentencing set aside through an ineffective-assistance-of-counsel claim.  See Sept. Tr. at 4:9-19 (Court).  The Court then asked Valencia what he would like the Court to do in terms of an opinion.  See Sept. Tr. at 4:20-23 (Court).  Valencia stated that "I think the Court needs to file whether it's a written or oral order indicating that based on the defendant not receiving his PSR, the Court will allow him to file a supplemental sentencing memorandum."  Sept. Tr. at 4:24-5:3 (Aarons).  The Court and Valencia further discussed how to dispose of Valencia's motion:

> THE COURT: Here's what I'll probably do, though [--] not probably this is what I'll do.  I'm going to take your [] petition for habeas and refer it to a magistrate judge.
>
> Now, the question is . . . if there is not going to be an appeal and you tell me that you don't really need the opinion to do your habeas case, that wouldn't be helpful.  I can get you a J & C entered th[is] afternoon and I . . . make the referral on the habeas case this afternoon as well.
>
> MR. AARONS: Yeah, if that's the fas[]test.
>
> THE COURT: That's the fastest.  You filed a petition, right?
>
> MR. AARONS: In essence, yeah, I filed a motion that cites to that statute.
>
> THE COURT: Well, I think you're going to have to file a petition.
>
> MR. AARONS: Right, I'm going to have to file a formal petition.
>
> THE COURT: And I can refer that down so I can do that or this is what you may want and I'm not telling you how to run it, but you may want me to get the opinion out to you, you go ahead and file your petition, and the magistrate, as they're making their recommendations has [my] thoughts as to what I did.  I'm going to write the opinion even if we hadn't had this hearing and read your stuff I'm going to write up what I did and why I did it. . . . [B]ut it seems to me we're barreling toward you filing a formal petition, me referring it to a magistrate Judge and the question is do you want it with my opinion here or I don't know are you going to try.
>
> . . . .

- 51 -

THE COURT: What if I did this.  This is a little bit unusual but I've done [it] before.  What if I go ahead and enter judgment, and then you go ahead and file your petition, and I'll get the opinion out while you're doing your stuff and I do my stuff, and but it won't slow anything down. . . .

MR. AARONS: I think it will help really if we get a resentencing that we kind of know where we started.

. . . .

MR. AARONS: All right so I will file the petition[], the Court's going to file a J and S.

THE COURT: Well, do this.  We'll file the judgment first, she'll go ahead and file it.  We've got an understanding I'll get the opinion out to you.

MR. AARONS: Afterwards.  Shortly afterwards.

THE COURT: Afterwards.  And then you file your 2255, and that way we won't slow anything down and I'll make an immediate referral to the magistrate judge, and have that go.  Does that sound like the best approach.

MR. AARONS: That's the best approach available, your Honor.

THE COURT: Okay.

Sept. Tr. at 5:4-8:3 (Aarons, Court).  In sum, Valencia and the Court agreed that the Court would first enter judgment, and Valencia would then file a formal petition under 28 U.S.C. § 2255.  The United States also agreed to this arrangement, and the parties did not have anything further to say on the Motion to Reduce Sentence.  See Sept. Tr. at 8:4-19 (Aarons, Court, Long).

## **LAW REGARDING THE GUIDELINES**

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those

factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written

reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007). Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory guideline sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).

## LAW REGARDING MITIGATING ROLE ADJUSTMENTS

U.S.S.G. § 3B1.2 authorizes courts to reduce a defendant's offense level if the defendant was a minimal or minor participant in an offense. See U.S.S.G. § 3B1.2; United States v. Aguilar, No. 04-311, 2005 WL 2313585, at *3 (D.N.M. Aug. 18, 2005)(Browning, J.). U.S.S.G. § 3B1.2 provides in full:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.
>
> In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2 (bold in original). "This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n. 3(A). Application note 3 further confirms that a court's task in determining the application of this guideline is highly fact-based: "The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2 cmt. n. 3(C).

In an amendment to this guideline effective on November 1, 2011, the United States Sentencing Commission removed the following sentence from application note 4: "It is intended that the downward adjustment for a minimal participant be used infrequently." U.S. Sentencing

Manual app. C, vol. III, at 406 (2011).  As a reason for this change, the Sentencing Commission

stated: "The Commission determined that [this sentence is] unnecessary and may have the

unintended effect of discouraging courts from applying the mitigating role adjustment in

otherwise appropriate circumstances."   U.S. Sentencing Manual app. C, vol. III, at 406.

Subsection (a) regarding minimal participants covers defendants "who are plainly among the

least culpable of those involved in the conduct of a group."  U.S.S.G. § 3B1.2 cmt. n. 4.  See also

United States v. Justice, No. 09-3078, 2012 WL 394455, at *9 (D.N.M. Jan. 23,

2012)(Browning, J).  "Under this provision, the defendant's lack of knowledge or understanding

of the scope and structure of the enterprise and of the activities of others is indicative of a role as

a minimal participant."  U.S.S.G. § 3B1.2 cmt. n. 4.  Subsection (b) covers a defendant who "is

less culpable than most other participants in the criminal activity, but whose role could not be

described as minimal."  U.S.S.G. § 3B1.2 cmt. n. 5.

For example, in United States v. Aguirre-Garcia, No. CR 08-0823 JB, 2009 WL 5851092

(D.N.M. Dec. 15, 2009)(Browning, J.), the Court concluded that a defendant was not entitled to a

mitigating role adjustment, because the defendant, with two co-defendants, knowingly

transported cocaine out of state on two occasions.  See 2009 WL 5851092, at **1-3.  Because

Aguirre-Garcia had the same knowledge and took the same actions as his co-defendants, in

driving a car which the defendants knew contained cocaine out of state, the Court found that

Aguirre-Garcia was not entitled to a mitigating role adjustment, even though Aguirre-Garcia had

purportedly informed his co-defendants that he did not want to transport drugs and was only

along for the ride.  See 2009 WL 5851092, at **1-3.  On the other hand, where a defendant

charged for conspiring to distribute methamphetamine possessed only seven grams out of the

400 grams involved in the conspiracy, and no other evidence supported the defendant being more

than a "user," the Court granted a minor role adjustment because a preponderance of the evidence did not support that the defendant was a "dealer," as were his co-defendants in the conspiracy.  United States v. Justice, No. CR 09-3078 JB, 2012 WL 394455, at **1-5, 9-10 (D.N.M. Jan. 23, 2012)(Browning, J.).

## LAW REGARDING THE IMPOSITION OF CRIMINAL FINES

There is a three-tier hierarchy of authority to which a district court must look when imposing a criminal fine.  At the top of the hierarchy, as always, is the Constitution of the United States of America.  The Eighth Amendment to the Constitution of the United States contains an Excessive Fines Clause, to which the appellate courts have given content over the years.[12]  See

_____

[12]The right to be free from excessive fines is one of the few remaining rights that the Supreme Court has not incorporated against the states.  When the Bill of Rights was adopted, none of the rights within it applied against state governments.  See Barron v. Baltimore, 32 U.S. 243, 250 (1833)(Marshall, C.J.)(holding that the first ten "amendments contain no expression indicating an intention to apply them to the State governments" and that, thus, "[t]his court cannot so apply them").  Cf. U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion . . . ."  (emphasis added)).  After the post-Civil War passage of the Fourteenth Amendment to the Constitution of the United States, however, the Supreme Court began using that Amendment's Due Process Clause, see U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." (emphasis added)), to "incorporate" the various individual liberties which the Bill of Rights contains against the states, e.g., McDonald v. City of Chicago, 561 U.S. 742, 752 (2010)(Alito, J.).

The Supreme Court did not incorporate the entire Bill of Rights in one fell swoop, however, but instead relied on a piecemeal process of "selective incorporation" -- basically, incorporating rights against the states one at a time, as the opportunities to do so arose. McDonald v. City of Chicago, 561 U.S. at 752.  The standard whether a Bill of Rights provision should be incorporated is whether the right is "implicit in the concept of ordered liberty," and "so rooted in the traditions and conscience of our people as to be ranked as fundamental." McDonald v. City of Chicago, Ill., 561 U.S. at 760.  See Washington v. Glucksberg, 521 U.S. 702, 721 (1997); Duncan v. Louisiana, 391 U.S. 145, 149 (1968); Palko v. Connecticut, 302 U.S. 319, 325 (1937).  To date, the Supreme Court has incorporated almost all of the Bill of Rights' provisions, including: the First Amendment to the Constitution's Free Speech Clause, see Gitlow v. New York, 268 U.S. 652, 666 (1925), its Free Exercise Clause, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), its Establishment Clause, see Everson v. Bd. of Educ., 330 U.S. 1, 16 (1947), and its guarantees of freedom of the press, see Near v. Minnesota, 283 U.S. 697, 707 (1931), its freedom of assembly, see DeJonge v. Oregon, 299 U.S. 353, 365 (1937), and its right

to petition the government for redress of grievances, see Edwards v. South Carolina, 372 U.S. 229, 237 (1963); the Second Amendment to the Constitution's right to bear arms, see McDonald v. City of Chicago, 561 U.S. at 742; the Fourth Amendment to the Constitution's right against unreasonable search and seizure, see Wolf v. Colorado, 338 U.S. 25, 27-28 (1949), its Warrant Clause, see Aguilar v. Texas, 378 U.S. 108, 110 (1964), and even, to some extent, its remedial gloss, the exclusionary rule, see Mapp v. Ohio, 367 U.S. 643, 655 (1961); the Fifth Amendment to the Constitution of the United States' privilege against self-incrimination, see Miranda v. Arizona, 348 U.S. 436, 467 (1966)(creating new anti-self-incrimination rights and immediately applying them against the states); Griffin v. California, 380 U.S. 609, 615 (1965)(applying pre-established anti-self-incrimination rights against the states), its Double Jeopardy Clause, see Benton v. Maryland, 395 U.S. 784, 796 (1969), and Takings Clause, see Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 258 (1897); the Sixth Amendment to the Constitution's rights to a public trial, see In re Oliver, 333 U.S. 257, 273 (1948), to assistance of counsel, see Gideon v. Wainwright, 372 U.S. 335, 343 (1963), to trial by jury, see Duncan v. Louisiana, 391 U.S. 145, 148-49 (1968), and to compulsory process, see Washington v. Texas, 388 U.S. 14, 19 (1967), and its Speedy Trial Clause, see Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967), and Confrontation Clause, see Pointer v. Texas, 380 U.S. 400, 403-04 (1965); and the Eighth Amendment's Cruel and Unusual Punishments Clause, see Robinson v. California, 370 U.S. 660, 666-67 (1962), and Excessive Bail Clause, see Schilb v. Kuebel, 404 U.S. 357, 365 (1971).

What remains is a collection of six rights that have either not been incorporated or whose incorporation status is unclear.  First, the Third Amendment to the Constitution's right to be free from quartering of soldiers in private homes, unsurprisingly, is not frequently invoked.  The United States Court of Appeals for the Second Circuit has held that the Third Amendment is incorporated, and the Tenth Circuit has suggested that it is, but the Supreme Court has not addressed the issue.  See United States v. Nichols, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988); Engblom v. Carey, 677 F.2d 957, 961 (2d Cir. 1982).  Second, the Supreme Court has expressly held that the Fifth Amendment's right to indictment by grand jury does not apply against the states.  See Hurtado v. California, 110 U.S. 516, 538 (1884).  (A topic for another day is that the institution of the grand jury has decayed from its standing at the Founding as a meaningful shield from unjust prosecution to its modern status as an investigatory sword for prosecutors.  It is not the worst thing in the world that the right was not incorporated.)  Third, the Sixth Amendment's Vicinage Clause does not appear to have been incorporated, although neither the Supreme Court nor the Tenth Circuit has commented on the subject.  See Caudill v. Scott, 857 F.2d 344, 346 (6th Cir. 1988); Cook v. Morrill, 783 F.2d 593, 595-96 (5th Cir. 1986); Zicarelli v. Dietz, 633 F.2d 312, 325-26 (3d Cir. 1980).  Fourth, the Supreme Court has held that the Constitution imposes one condition on federal criminal juries that it does not impose on their state counterparts: that their verdicts be unanimous.  See Williams v. Florida, 399 U.S. 78, 103 (1970).  These unincorporated Sixth Amendment "rights" are unique, in that they have no basis in the Sixth Amendment's text; the Supreme Court read a penumbra onto the Amendment's use of "trial[] by . . . jury," which it applies against the federal government but not against the states. U.S. Const. amend. VI.  Fifth, and probably the most important unincorporated right, the Seventh Amendment to the Constitution's right to a civil jury trial -- and its right against re-examination of a jury verdict, although that right has little meaning without a broader jury-trial right -- does not apply against the states.  See Minneapolis & St. Louis R.R. Co. v. Bombolis, 241 U.S. 211,

218 (1916).  Sixth and finally, "[t]here is a surprising amount of confusion as to whether the Excessive Fines Clause has been incorporated."  Reyes v. N. Tex. Tollway Auth., 830 F. Supp. 2d 194, 206 (N.D. Tex. 2011)(Fish, J.).

In Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257 (1989)("Browning-Ferris"), the Supreme Court held that the Excessive Fines Clause does not place limits on punitive damages in suits between private parties.  492 U.S. at 260.  The Supreme Court did not address incorporation, but the Honorable Sandra Day O'Connor, then-Associate Justice of the Supreme Court, addressed the issue.  The case involved a diversity suit and, while the majority saw no reason to delve into the incorporation issue -- the trial, after all, occurred in federal court -- Justice O'Connor apparently felt that, because Vermont state law had supplied the substantive law giving rise to the punitive damages, the incorporation issue was a threshold question.  The majority declined to address the issue:

> Because of the result we reach today, we need not answer several questions that otherwise might be necessarily antecedent . . . .  We shall not decide whether the Eighth Amendment's prohibition on excessive fines applies to the several States through the Fourteenth Amendment, nor shall we decide whether the Eighth Amendment protects corporations as well as individuals.

Browning-Ferris, 492 U.S. at 276 n.22.  Justice O'Connor did not perform much analysis, but she made her position on the issue clear:

> Since Robinson, the Cruel and Unusual Punishments Clause has been regularly applied to the States, most notably in the capital sentencing context.  In addition, the Court has assumed that the Excessive Bail Clause of the Eighth Amendment applies to the States.  I see no reason to distinguish one Clause of the Eighth Amendment from another for purposes of incorporation, and would hold that the Excessive Fines Clause also applies to the States.

Browning-Ferris, 492 U.S. at 284 (O'Connor, J., concurring in part and dissenting in part, joined by Stevens, J.)(citation omitted).  Before Browning-Ferris, apparently no court -- either federal or state -- had addressed whether the Excessive Fines Clause is incorporated.  That almost every state has an equivalent to the Clause in its state constitution -- much like the Seventh Amendment's right to a civil jury trial -- perhaps explains this gap in the case law.  See Browning-Ferris, 492 U.S. at 264 & n.5.

Over a span of about three years beginning roughly a decade after Browning-Ferris, the United States Courts of Appeals for the Fifth, Seventh, and Ninth Circuits each held that the Excessive Fines Clause is incorporated against the states.  See Watson v. Johnson Mobile Homes, 284 F.3d 568, 572 (5th Cir. 2002); Wright v. Riveland, 219 F.3d 905, 915-19 (9th Cir. 2000); Towers v. City of Chicago, 173 F.3d 619, 623-24 (7th Cir. 1999).  More importantly, around the same time, the Supreme Court issued a seemingly authoritative word on the matter.  In Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001)("Cooper"), the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court -- who had been the sole Justice to join Justice O'Connor's opinion in Browning-Ferris -- wrote for the majority that,

> [d]espite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion.  That Clause makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States.

Cooper, 532 U.S. at 433-34 (citation omitted).

Although this proclamation would seem to have closed discussion on the question of incorporation, the Supreme Court reopened it again in 2010.  In McDonald v. City of Chicago, the Supreme Court welcomed the Second Amendment's right to bear arms into the pantheon of incorporated rights (it remains its newest member).   The Honorable Samuel A. Alito, Jr., Associate Justice of the Supreme Court, writing for the majority, described the doctrine of selective incorporation in detail, noting:

> In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict), the only rights not fully incorporated are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines.

> We never have decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause.  See Browning-Ferris, 492 U.S. at 276, n.22 (declining to decide whether the excessive-fines protection applies to the States).

McDonald v. City of Chicago, Ill., 561 U.S. at 765 n.13.  The most recent word from the Supreme Court is, thus, that the right against excessive fines is "not fully incorporated," because the Supreme Court "never ha[s] decided whether" it is incorporated. 561 U.S. at 765 n.13.  See 2 William J. Rich, MODERN CONSTITUTIONAL LAW § 26:3 n.14 (3d ed. 2011)(Incorporation of the Bill of Rights)(listing the right against excessive fines as an unincorporated right); 1 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, CRIMINAL PROCEDURE § 2.6(b) (3d ed. 2011)(Guarantees not yet incorporated)(listing the Excessive Fines Clause).

That the Supreme Court has not yet issued a case expressly incorporating the Excessive Fines Clause, however, does not mean that it is not incorporated.  There are three rungs on the incorporation ladder: (i) rights that the Supreme Court has expressly incorporated; (ii) rights on which the Supreme Court has either remained silent, or has stated that they "remain unincorporated," "have not yet been incorporated," or "are not incorporated"; and (iii) rights that the Supreme Court has expressly held do not apply against the states.  Most rights in the Bill of Rights are now in the first category.  The Third Amendment's protection against quartering soldiers, Sixth Amendment's Vicinage Clause, and the Eight Amendment's Excessive Fines Clause are the second category.   The Fifth Amendment's grand-jury right, the Sixth Amendment's rights to a unanimous, twelve-person criminal jury, and the Seventh Amendment's civil jury right are in the third category.

     The Supreme Court's placement of rights into the first and third categories constitutes legal holdings on issues of federal law, and thus bind all state and federal courts nationwide. While the third category is binding as a matter of vertical stare decisis -- no lower federal court nor, technically, any state court may hold that, e.g., the federal constitutional grand-jury right applies to the states, because there is a Supreme Court case, Hurtado v. California, which expressly holds to the contrary -- the vitality of the analysis in those cases, as a matter of horizontal stare decisis, is suspect.  See McDonald v. City of Chicago, Ill., 561 U.S. at 765 n.13 ("Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement long predate the era of selective incorporation."). The second category, however, reflects the Supreme Court's decision not to pass on the incorporation question -- and subsequent acknowledgements of the decision not to pass on the question -- as a matter of constitutional avoidance.  These decisions do not constitute "holdings" and thus do not bind either the state or federal courts.  In fact, several federal appellate courts have held that rights in the second category are incorporated.  United States v. Nichols, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988)(Third Amendment); Englblom v. Carey, 677 F.2d at 961 (same); Caudill v. Scott, 857 F.2d at 346; Cook v. Morrill, 783 F.2d at 595-96 (Vicinage Clause); Zicarelli v. Dietz, 633 F.2d at 325-26 (same); Watson v. Johnson Mobile Homes, 284 F.3d at 572 (Excessive Fines Clause); Wright v. Riveland, 219 F.3d at 915-19 (same); Towers v. City of Chicago, 173 F.3d at 623-24 (same).

     Two particularities of the incorporation context often obfuscate this seemingly mundane observation -- that the Supreme Court's avoidance of a question is not binding as a negative answer to that question.  First, only the Supreme Court -- and not the Courts of Appeals -- can bind state courts, even on matters of federal law (no federal court, including the Supreme Court, can bind state courts on matters of state law).  See Steffel v. Thompson, 415 U.S. 452, 482 n.3 (1974)(Rehnquist, J., joined by Burger, C.J., concurring); Perez v. Ledesma, 401 U.S. 82, 125 (1971)(Brennan, J., joined by White & Marshall, JJ., dissenting)(referring to "the persuasive force" of a decision of a lower federal court on state courts); Daniel J. Meltzer, State Court Forfeitures of Federal Rights, 99 HARV. L. REV. 1130, 1231 n.495 (1986); David L. Shapiro, State Courts and Federal Declaratory Judgments, 74 NW. U. L. REV. 759, 771 (1979).  At least some state courts consider themselves bound by federal lower-court interpretations of federal law; it is not clear whether they view federal district court opinions, or only intermediate-appellate decisions, as binding.  See Handy v. Goodyear Tire & Rubber Co., 160 So. 530 (Ala. 1935)(holding that the federal appellate courts' "decision[s] involv[ing] construction and application of [a] federal statute . . . [are] binding on state courts").  The Supreme Court of Utah expressed a similar opinion:

> If, therefore, there is a decision from a federal court which is decisive of the question here, and especially if the federal decision is one that is more recent than the one cited from a state court, it is our duty to follow the federal court rather than the state court, since the question involved is one upon which the federal courts have the ultimate right to speak.

Kuchenmeister v. Los Angeles & S.L.R., 172 P. 725, 727 (Utah 1918).  This rule -- that only the Supreme Court can bind the states -- is always true -- its application is not limited to decisions about incorporation, but its impact in the incorporation context virtually nullifies any decision

that the lower federal courts might make whether a right is incorporated.  Because the only effect of a holding that a right is incorporated is that the right applies against the state -- the holding says nothing about the right's substance or scope -- and because the state courts are free to ignore lower federal court holdings on the issue, the only binding effect that such a holding has is the potential creation of a federal court-only civil cause of action against the state; the rights that the lower federal courts incorporate cannot even give rise to federal habeas relief.  See Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("[A] writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication . . . was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . . ."  (emphasis added)).

To some extent, this situation always exists between the lower federal courts and the state courts; for example, if the Supreme Court of New Mexico interpreted the Supreme Court's First Amendment precedent as not protecting expressive activity X, and the Tenth Circuit interpreted the First Amendment to protect X, then citizens that New Mexico punished for partaking in X would be limited to the federal courts in seeking recourse.  That example, however, follows the pattern that the Court already laid out as being the only effective result of a lower federal court incorporation holding: case-by-case resolution of individual claims in the federal courts.  The more systemic impacts that judicial opinions often have -- the ones that have an effect on individuals beyond those who come directly before the courts, such as striking down statutes and invalidating programs -- would seem to be off the table as it relates to rights that only the lower federal courts have incorporated.  For example, the Second Circuit held that the Third Amendment's protection against quartering soldiers is incorporated against the states.  See Engblom v. Carey, 677 F.2d at 961.  While that holding may seem to entail that the Third Amendment prohibits the states of Connecticut, New York, and Vermont from quartering soldiers in private residences, any of those states' legislatures could adopt a soldier-quartering program, and the state's supreme court could, without flouting the law, uphold it.  This example is designed for a specific purpose; in all likelihood such a program would violate the federal Fourth Amendment, and several other federal and state laws.  The program's victims could, on a case-by-case basis, file for individual relief in federal court, and the federal courts could grant the relief, but the state courts would be under no obligation to align their rulings with the federal courts' until the Supreme Court speaks on the issue.  It is not entirely clear whether, under such circumstances, a federal judgment purporting to strike down the program would be valid.  See Yniguez v. Mofford, 939 F.2d 727, 730 n.1, 735-37 & nn.7-11 (9th Cir. 1991)(Reinhardt, J.).  Lower federal court holdings regarding incorporation are thus different from other lower federal court interpretations of federal law: the applicability of most federal law -- i.e., the United States Code -- to the states is not in dispute, even if its precise scope and meaning is, see U.S. Const. art. VI, cl. 2 (Supremacy Clause); the only other context in which the potential for such a standoff between the lower federal courts and the state courts exists is with federal preemption doctrine.

The second peculiarity that causes incorporation doctrine to be decided almost exclusively at the Supreme Court-level is that, although they can, state courts have little incentive to hold that a federal constitutional right is incorporated if the Supreme Court has left the question open.  The Bill of Rights is a floor, not a ceiling, and state courts can interpret their own constitutions -- which often contain provisions closely mirroring the federal Bill of Rights -- or statutes to provide for the right in question.  See Pena v. Greffet, No. CIV 12-0710 JB/KBM,

2015 WL 3860084, at *25 (D.N.M. June 17, 2015)(Browning, J.)(citing State v. Cardenas-Alvarez, 2001-NMSC-017, ¶¶ 32–35, 25 P.3d 225, 237-40)(discussing the New Mexico state courts' embrace of "New Federalism," a doctrine of state-level expansion on federal constitutional rights, which the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, championed).  By voluntarily holding that an as-yet unincorporated federal constitutional provision binds them, they risk (i) that the Supreme Court will overrule them and hold that the provision is not incorporated -- possibly even resulting in an unfixable reversal in the case in which the state supreme court applied the right, if the state supreme court did not go out of its way to additionally base its decision on an adequate and independent state ground, see Michigan v. Long, 463 U.S. 1032 (1983); or (ii) that the Supreme Court will, in subsequent decision, go on to define the contours of the right in a way that the state supreme court does not like.

        For its part, the Court concludes that the Excessive Fines Clause is incorporated against the states.  The Court does not fully subscribe to Justice O'Connor's reasoning that there is "no reason to distinguish one Clause of the Eighth Amendment from another for the purposes of incorporation."  Browning-Ferris, 492 U.S. at 287.  Whatever the merits of Justice O'Connor's stance may be, the Supreme Court parses amendments down into their constituent clauses and rights for incorporation purposes -- sometimes incorporating some, but not all, of an amendment. Compare Hurtado v. California, 110 U.S. at 538 (holding that states need not honor the Fifth Amendment grand-jury right) with Griffin v. California, 380 U.S. at 615 (incorporating the Fifth Amendment right against self-incrimination against the states); Benton v. Maryland, 395 U.S. at 796 (incorporating the Fifth Amendment probation on successive prosecutions); and Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. at 258 (incorporating the Fifth Amendment right against deprivation of property without just compensation).  To the Court, however, the nature of a criminal fine is that each of its properties -- its purpose, the severity of its incursion on liberty, and the legal process attendant to its imposition -- overlap with at least one of the following: (i) punitive damages; (ii) criminal imprisonment; and (iii) bail.  Each of those three incursions on personal liberty is subject to federal constitutional constraints, even when a state imposes them.  See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-75 (1996) (holding that punitive damages that a state court imposed pursuant to state law violated the federal Due Process Clause); Kennedy v. Louisiana, 554 U.S. 407, 419 (2008)(holding that the federal Cruel and Unusual Punishments Clause imposes on state court proceedings a proportionality requirement between the severity of a crime and the magnitude of its sentence); Schilb v. Kuebel, 404 U.S. at 365 (incorporating the Excessive Bail clause against the states). The Court will compare criminal fines with each of these other penalties and describe how their similarities support incorporation of the Excessive Fines Clause.

        Punitive damages involve the same liberty incursion -- deprivation of money -- for much the same purpose -- to punish -- and are imposed subject to a similar process -- a trial on the merits.  The case for applying constitutional strictures to criminal fines is, in most ways, stronger than the case for applying them to civil fines: a government has a greater incentive to abuse monetary impositions when it is the direct recipient of the money than when it is refereeing a dispute between private third parties.  Cf. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").  The recent unrest in Ferguson, Missouri, provides a good example of the hazards of vesting governments with the unchecked authority to fine:

_____

> The City budgets for sizeable increases in municipal fines and fees each year, exhorts police and court staff to deliver those revenue increases, and closely monitors whether those increases are achieved. . . .
>
> . . . .
>
> Ferguson has allowed its focus on revenue generation to fundamentally compromise the role of Ferguson's municipal court. The municipal court does not act as a neutral arbiter of the law or a check on unlawful police conduct. Instead, the court primarily uses its judicial authority as the means to compel the payment of fines and fees that advance the City's financial interests. . . .
>
> . . . .
>
> To handle the increasing caseload, the City Manager also requested and secured City Council approval to fund additional court positions, noting in January 2013 that "each month we are setting new all-time records in fines and forfeitures," that this was overburdening court staff, and that the funding for the additional positions "will be more than covered by the increase in revenues."
>
> . . . .
>
> [F]or fiscal year 2015, the City's budget anticipates fine and fee revenues to account for $3.09 million of a projected $13.26 million in general fund revenues.
>
> . . . .
>
> Even more recently, the City's Finance Director stated publicly that Ferguson intends to make up a 2014 revenue shortfall in 2015 through municipal code enforcement, stating to Bloomberg News that "[t]here's about a million-dollar increase in public-safety fines to make up the difference." . . .

United States Department of Justice Civil Rights Division, Investigation of the Ferguson Police Department, 2, 3, 9, 10, 13  (March 4, 2015)(footnotes omitted).  Originally intended primarily to investigate the shooting death of an African-American teenager at the hands of a Ferguson police officer, the DOJ's investigation ultimately produced a 105-page final report devoted primarily to the city's allegedly exploitative and excessive fine-administration and -collection system.

The constitutional procedural protections attendant to criminal proceedings, namely the beyond-a-reasonable-doubt standard and the right to assistance of counsel -- which existence (and incorporation) might seem to obviate the need for the additional incorporation of a protection against excessive criminal fines -- do not typically apply unless the crime or violation also carries the potential for a prison sentence, in addition to a fine.  See Blanton v. City of N. Las Vegas, 489 U.S. 538 (1989)(holding that the Sixth Amendment does not guarantee a jury trial on petty offenses, which presumptively includes all crimes whose maximum sentence of

incarceration is below six months, but leaving room for the possibility that "additional penalties [such as monetary fines] . . . [may be] so severe [as to indicate] that the legislature clearly determined that the offense is a serious one" meriting a jury trial); Scott v. Illinois, 440 U.S. 367 (1979)(holding that there is presumptively no right to assistance of counsel when the defendant does not face the possibility of incarceration). Even when the threshold finding of criminal guilt is predicated on a jury verdict (or waiver thereof) by proof beyond a reasonable doubt, a judge -- by way of a combination of preponderance-of-the-evidence factfinding and judicial discretion -- typically decides both the binary determination whether to impose a find and the incremental determination of its amount.

The similarities between fines, and cruel and unusual punishment, also cut in favor of incorporation. Criminal fines exist to effectuate the same goals as the punishments to which the Cruel and Unusual Punishments Clause refers: deterrence -- both specific and general; incapacitation; rehabilitation; and punishment. 18 U.S.C. § 3553(a) (titled "Factors to be considered in imposing a sentence"); id. § 3572(a) (directing district courts to consider "the factors set forth in section 3553(a)" in "determining whether to impose a fine, and the amount"). See United States v. Courtney, No. CR 11-2860 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.)(outlining the differences between specific and general deterrence). It is important to note that fines, unlike restitution and costs of prosecution -- and unlike non-punitive damages, for that matter -- lack any compensatory purpose. Fines and incarceration are typically imposed via the same basic procedural mechanisms: a beyond-a-reasonable-doubt trial (or waiver thereof) at the liability phase, followed by preponderance-of-the-evidence judicial factfinding and discretion at the penalty phase. Moreover, there is a key overlap in the analytical standards of both the Cruel and Unusual Punishments Clause, and the Excessive Fines Clause: both require a loose proportionality between the crime committed and the penalty imposed. See Kennedy v. Louisiana, 554 U.S. at 419 ("[T]he Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" (citing Weems v. United States, 217 U.S. 349, 367 (1910))(alterations in Kennedy v. Louisiana but not in Weems v. United States)); United States v. Bajakajian, 524 U.S. 321, 334 (1998)("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." (citing Austin v. United States, 509 U.S. 602, 622-23 (1993))). Of course, the nature of the penalties with which the Cruel and Unusual Punishments Clause deals -- incarceration and the death penalty -- are more serious than those with which the Excessive Fines Clause deals, and that fact cuts against incorporation of the latter Clause against the states, but the similarities between the two Clauses are still great enough to be instructive.

Last, criminal fines share some features with bail. Both are monetary impositions associated with a criminal case. Bail has the fewest procedural safeguards associated with it of any of the penalties discussed -- bail is imposed while the defendant is presumed innocent, with relatively minimal process -- and thus the justifications for incorporating the Excessive Bail Clause's substantive constraints on the magnitude of the bail are strong. Still, one's failure to pay a designated fine, like one's failure to pay an assigned bail amount, often results in jail. In the bail context, the Constitution deals with this potentially hazardous opportunity for governmental abuse by imposing substantive limitations on bail -- i.e., limiting its amount -- rather than procedural ones, such as requiring a certain burden of proof or factfinding process. While there are procedural protections built into the federal bail-setting process, they are

U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").  At the hierarchy's middle tier -- mandatory for the district court, but subject to the Excessive Fines Clause's constraints -- are three United States Code sections: the general sentencing statute, 18 U.S.C. § 3553(a), and the fines-specific sentencing statute, 18 U.S.C. § 3572(a), both of which bow to the substantive criminal statute under which the defendant is convicted, which obviously varies depending on the case.  At the third and lowest level -- nonbinding on the district court[13] -- are two Guidelines provisions: the

---

statutory, not constitutional, and apply only to the federal courts.  See 18 U.S.C. §§ 3141-3150. The Supreme Court has incorporated the Excessive Bail Clause's substantive safeguards against the states.  See Schilb v. Kuebel, 404 U.S. at 365.  If the Supreme Court deemed it to be "implicit in the concept of ordered liberty" to have substantive safeguards against one form of "excessive" imprisonment-threatening monetary imposition, then it probably follows that the Constitution's analogous constraints on the other form mentioned in the same amendment should, likewise, be incorporated.

[13]Attorneys and courts often say that "the Guidelines are . . . advisory," but it appears more appropriate to say that the Guidelines ranges are advisory.  Gall v. United States, 552 U.S. 38, 46 (2007)("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the guideline range, see Gall v. United States, 522 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated guideline range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2–3 (D.N.M. July 16, 2010)(Browning, J.).

 The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken

general fines guideline, U.S.S.G. § 5E1.2, and the guideline for the substantive offense, which overrides it.  As is typical of such hierarchies, the successively lower tiers of authority provide more specific and detailed guidance about what the district court should do, and -- while it should not be assumed -- compliance with the lower-tier authority is likely to produce compliance with the higher-tier authority.  See Kimbrough v. United States, 552 U.S. 85, 89 (2007)(stating that, in the ordinary case, the Guidelines "sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives'" (quoting Rita v. United

---

as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence"  (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d at 1222-24 (emphasis in original).

States, 551 U.S. 338, 350 (2007))); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006) ("[A] sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness."); United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007) ("[I]t was error for the district court to apply the appellate presumption of reasonableness to the advisory guidelines when sentencing."   (citing Rita v. United States, 551 U.S. 338)). Accordingly, district courts should start with the Guidelines and then move to the statute in selecting an appropriate fine, and only then analyze whether the selected fine violates the Excessive Fines Clause.  Cf. U.S.S.G. § 1B1.1; United States v. Nolf, 30 F. Supp. 3d 1200, 1222-42 (D.N.M. 2014)(Browning, J.)(concluding that district courts must follow a certain sequence during sentencing, first calculating the Guidelines range and then looking to statutory considerations).  The Court will describe, in order, the steps involved in imposing a criminal fine.

### 1.      The Court Must First Calculate the Guidelines Range.

The Guidelines direct that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," although the Guidelines' overall advisory status post-United States v. Booker, as a practical matter, undoes the text's mandatory language.  U.S.S.G. § 5E1.2(a).  The Guidelines set forth a four-step process for imposing fines.

### a.      Step One: Assess the Defendant's Ability to Pay.

Anyone can serve a prison sentence, but not everyone can pay a fine.   The fine guideline's exception for "defendant[s who] establish[] that [they are] unable to pay and [are] not likely to become able to pay any fine" trumps, as a practical matter, everything else in the determining whether to impose a fine.  U.S.S.G. § 5E1.2(a).

> The determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay any fine. The inability of a defendant to post bail bond (having otherwise been determined eligible for release) and the fact that a defendant is represented by (or was determined eligible for) assigned counsel are significant indicators of present inability to pay any fine. In conjunction with other factors, they may also indicate that the defendant is not likely to become able to pay any fine.

U.S.S.G. § 5E1.2 cmt. 3. If the defendant is unable to pay a fine, the district court should impose other forms of punishment in lieu of the appropriate fine; the district court should not simply waive the fine. See U.S.S.G. § 5E1.2(e). Community service is the preferred alternative punishment when fines are unavailable. See U.S.S.G. § 5E1.2(e).

This assessment starts with the defendant's literal ability to pay -- i.e., the figure that the defendant could pay if the defendant both liquidated all of his or her assets, and devoted all the future discretionary income that he or she is likely to earn to paying the fine -- but the district court may[14] cap this figure at the point at which the defendant actually paying it "would unduly burden the defendant's dependents" or other third parties. U.S.S.G. § 5E1.2(e). The Guidelines give no further guidance on how to determine a defendant's ability to pay, but, at this stage, the district court's focus should be on ascertaining the maximum fine available to be imposed -- including whether the defendant can pay any fine -- rather than on balancing the defendant's resources and the fine's effect on third parties against the need for the fine. The district court can

_____

[14]The Guidelines say "may," and not "must" or "shall." U.S.S.G. § 5E1.2(e). The Guidelines do not specify to what factors the district court should look in deciding whether and to what extent to reduce a fine on the basis of the hardships it would cause to third parties. The Court, however, concludes that three primary factors should be: (i) the number of third parties affected and magnitude of their hardship; (ii) their degree of culpability in the defendant's criminal conduct -- meaning their own probable innocence and their lack of knowledge of the conduct; and (iii) the extent to which the third parties function as a support system for the defendant and the likelihood that their avoiding the financial hardships of a fine will translate into reduced odds of recidivism for the defendant.

conduct that balancing after determining the Guidelines range for the fine, at the statutory-factors stage.

### b.        Step Two: Check for Overrides.

The second step is a check for overrides.  First, the district court should check the guideline for the substantive offense, and, "[i]f . . . the guideline for the offense in Chapter Two provides a specific rule for imposing a fine, that rule takes precedence over" the generic fine guideline.  U.S.S.G. § 5E1.2(b).  Second, the district court should also check the statute of conviction, and, if the statute authorizes either a maximum fine greater than $250,000.00 or a daily compounding fine, then the district court -- which must still go through the other steps of the Guidelines fine calculation -- should replace the Guidelines range's maximum fine with the statutory maximum fine.  See U.S.S.G. § 5E1.2(c)(2), (4).

### c.        Step Three: Calculate the Offense Level.

The third step is the same one that applies when determining the proper sentence of imprisonment to impose; this calculation need only be done once, and if the Court has already calculated the defendant's offense level for incarceration purposes, the offense level is the same for fine purposes.  In determining a defendant's offense level, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt. 1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

- 70 -

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3 provides that the base offense level under the Guidelines "shall be

determined" based on the following:

> **(1)** **(A)** all acts and omissions committed, aided, abetted,
> counseled, commanded, induced, procured, or willfully
> caused by the defendant; and
>
> **(B)** in the case of a jointly undertaken criminal activity (a
> criminal plan, scheme, endeavor, or enterprise undertaken
> by the defendant in concert with others, whether or not
> charged as a conspiracy), all reasonably foreseeable acts
> and omissions of others in furtherance of the jointly
> undertaken criminal activity, that occurred during the
> commission of the offense of conviction, in preparation for
> that offense, or in the course of attempting to avoid
> detection or responsibility for that offense;
>
> **(2)** solely with respect to offenses of a character for which § 3D1.2(d) would
> require grouping of multiple counts, all acts and     omissions     described
> in subdivisions (1)(A) and (1)(B) above that were part of the same course
> of conduct or common scheme or plan as the offense of conviction;
>
> **(3)** all harm that resulted from the acts and omissions specified in subsections
> (a)(1) and (a)(2) above, and all harm that was the object of such acts and
> omissions; and
>
> **(4)** any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not

resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards

lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may

rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence

standard. See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.),

aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x 132, 135

(10th Cir. 2009)(unpublished)[15]("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997)(per curiam).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at

---

[15]United States v. Schmidt is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009), and United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), have persuasive value with respect to material issues and will assist the Court in its disposition of this Memorandum Opinion and Order.

392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed with the defendant and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments that the Fifth Amendment's Double Jeopardy Clause protects.  See 515 U.S. at 395.  The Fifth Circuit reversed the district court's ruling and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of

which the defendant was convicted." 515 U.S. at 401. The Supreme Court reasoned that sentencing courts had always considered relevant conduct and that "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." 515 U.S. at 402. Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. See 519 U.S. at 154. In reaching this result, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted if the United States establishes that conduct by a preponderance of the evidence. See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. See United States v. Watts, 519 U.S. at 151. According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts

have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was

possessed during the drug offense."); <u>United States v. Rodriguez</u>, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm. <u>See</u> <u>United States v. Coleman</u>, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved. <u>See</u> 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In <u>United States v. Washington</u>, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence. <u>See</u> 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life. <u>See</u> 11 F.3d at 1515. The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515. Although the Tenth Circuit in <u>United States v. Washington</u>

"recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).[16]

### d.   Step Four: Determine the Guidelines Range.

Once the district court has calculated the offense level, it can determine the Guidelines fine range. Unlike with imprisonment, the defendant's criminal history has no impact on his or her Guidelines fine range. Also unlike with imprisonment, the Guidelines establish different fine ranges only for different bands of offense levels, and not for each successive offense level. The following table shows the Guidelines fine ranges for various offense-level bands:

---

[16]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since described its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)). See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level by 4 levels; United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

| Offense Level | Minimum Fine | Maximum Fine |
|---|---|---|
| ≤ 3 | $100.00 | $5,000.00 (or statutory maximum, if applicable) |
| 4-5 | $250.00 | $5,000.00 (or statutory maximum, if applicable) |
| 6-7 | $500.00 | $5,000.00 (or statutory maximum, if applicable) |
| 8-9 | $1,000.00 | $10,000.00 (or statutory maximum, if applicable) |
| 10-11 | $2,000.00 | $20,000.00 (or statutory maximum, if applicable) |
| 12-13 | $3,000.00 | $30,000.00 (or statutory maximum, if applicable) |
| 14-15 | $4,000.00 | $40,000.00 (or statutory maximum, if applicable) |
| 16-17 | $5,000.00 | $50,000.00 (or statutory maximum, if applicable) |
| 18-19 | $6,000.00 | $60,000.00 (or statutory maximum, if applicable) |
| 20-22 | $7,500.00 | $75,000.00 (or statutory maximum, if applicable) |
| 23-25 | $10,000.00 | $100,000.00 (or statutory maximum, if applicable) |
| 26-28 | $12,500.00 | $125,000.00 (or statutory maximum, if applicable) |
| 29-31 | $15,000.00 | $150,000.00 (or statutory maximum, if applicable) |
| 32-34 | $17,500.00 | $175,000.00 (or statutory maximum, if applicable) |
| 35-37 | $20,000.00 | $200,000.00 (or statutory maximum, if applicable) |
| ≥ 38 | $25,000.00 | $250,000.00 (or statutory maximum, if applicable) |

U.S.S.G. § 5E1.2(c)(3).

## 2.  **The Court Must Then Consult the Statutory Factors.**

In addition to any fine provisions that the substantive statute of conviction may contain, there are two statutes that always apply to the imposition of criminal fines.  Section 3553(a) governs sentencing generally -- incarceration, supervised release, probation, fines, and restitution -- while § 3572(a) covers fines, specifically.  If there were any question whether § 3553(a) still applies to fines despite the existence of a more specific statute, § 3572(a) puts them to rest, directing courts to consider the § 3572(a) factors "in addition to the factors set forth in section 3553(a)."  18 U.S.C. § 3572(a).

These two sections are on equal footing -- neither is subordinate to or subject to the other -- and each contains a list of factors for the district court to consider in imposing its sentence.  The fourteen[17] pertinent factors are: (i) the offense's nature and circumstances, and the

_____

[17]Section 3553(a) contains seven factors and § 3572(a) contains eight factors.  The Court has also omitted one of the § 3553(a)(2) subfactors, the need "to provide the defendant with

defendant's history and characteristics, see 18 U.S.C. § 3553(a)(1); (ii) the need for the sentence imposed to reflect the offense's seriousness, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from the defendant's further crimes, see 18 U.S.C. § 3553(a)(2); (iii) the Guidelines fine range, see 18 U.S.C. § 3553(a)(4); (iv) whether the defendant has previously been fined for a similar offense, whether the defendant faces collateral consequences, such as civil lawsuits, from his or her actions, and any other pertinent Guidelines policy statements, see 18 U.S.C. § 3553(a)(5); U.S.S.G. § 5E1.2(d)(5)-(6);[18] (v) the need to avoid unwarranted fine disparities among defendants with similar records who have been found guilty of similar conduct, see 18 U.S.C. § 3553(a)(6); (vi) the need to provide restitution to any victims of the offense, see 18 U.S.C. § 3553(a)(7); (vii) the defendant's income, earning capacity, and financial resources, see 18 U.S.C. § 3572(a)(1); (viii) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on

_____

needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," because it is inapplicable to fines. 18 U.S.C. § 3553(a)(4)(D).

[18]Section 3553(a)(5) directs district courts to consider "any pertinent policy statement" in the Guidelines. 18 U.S.C. § 3553(a)(5). The Guidelines contain their own list of 8 factors for the district court to consider when selecting where exactly, within the offense level-determined Guidelines range, to set the fine. See U.S.S.G. § 5E1.2(d). Of these 8 factors, however, only 2 are not already covered by the fine statute, § 3572(a): (i) "any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;" and (ii) "whether the defendant previously has been fined for a similar offense." U.S.S.G. § 5E1.2(d)(5)-(6). Rather than summarize the Guidelines factors in full at the Guidelines-calculation stage and then largely repeating those same factors at the variance stage, the Court will incorporate the two non-statutory § 5E1.2(d) factors into the § 3553(a) factor that directs district courts to consider them. This treatment is appropriate, given that the § 5E1.2(d) factors, despite being in the Guidelines, do not go to determining the Guidelines range, which is determined based solely on offense level. See U.S.S.G. § 5E1.2(c).

the defendant, relative to the burden that alternative punishments would impose, see 18 U.S.C. § 3572(a)(2); (ix) any pecuniary loss inflicted upon others as a result of the offense, see 18 U.S.C. § 3572(a)(3); (x) whether restitution is ordered or made and the amount of such restitution, see 18 U.S.C. § 3572(a)(4); (xi) the need to deprive the defendant of illegally obtained gains from the offense, see 18 U.S.C. § 3572(a)(5); (xii) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence, see 18 U.S.C. § 3572(a)(6); (xiii) whether the defendant can pass on to consumers or other persons the expense of the fine, see 18 U.S.C. § 3572(a)(7); and (xiv) if the defendant is an organization, the size of the organization and any measures it has taken to discipline any officer, director, employee, or agent of the organization responsible for the offense or to prevent a recurrence of such an offense.  Some of these factors are categorically inapplicable to certain cases or defendants.  Factor (xiv), and usually factor (xiii), apply only to business-entity defendants.  See 18 U.S.C. § 3572(a)(6)-(7).  Factors (vi) and (x), which concern restitution, are inapplicable to cases that lack an identifiable victim.[19]  See 18 U.S.C. §§ 3553(a)(7), 3572(a)(4). In cases where restitution is involved, however, those factors are of paramount importance, as the district court's imposition of a fine must not impede the defendant's ability to pay restitution. See 18 U.S.C. § 3572(b) ("[T]he court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution.").

---

[19]District courts should still consider factor (ix), "any pecuniary loss inflicted upon others as a result of the offense," even when there is no identifiable victim.  18 U.S.C. § 3572(a)(3). Congress listed this factor separately from the restitution factor, and the court should seek to give that drafting decision content.  If the defendant's crime did not inflict any pecuniary loss on anyone -- and just because a crime lacks an identifiable victim does not mean that this is the case -- then this factor cuts in the defendant's favor.  See United States v. Valdez, No. CR 13-0559-2 JB, 2014 WL 7473803, at *28 n.16 (D.N.M. Dec. 15, 2014)(Browning, J.).

The district court must weigh these factors to determine where in the Guidelines range to fine the defendant or whether to vary from the Guidelines fine range.  If the defendant can pay some, but not all, of an appropriate-level fine, or if imposition of an appropriate fine would cause some hardship to third parties, the district court may exercise its discretion and replace some of the fine with other punishment, preferably community service.  See U.S.S.G. § 5E1.2(e).  The district court may not, however, impose a fine alongside an alternative sentence -- effectively giving the defendant a choice of sanctions, or a fallback if he or she is unable to pay the fine -- but, rather, must impose a sum certain at the point of sentencing.  See 18 U.S.C. § 3572(e) ("[T]he court may not impose an alternative sentence to be carried out if the fine is not paid.").  That said, a district court may make timely payment of the fine, or installments thereof, a condition of probation or supervised release.  See U.S.S.G. § 5E1.2(f).

As is the case generally with sentencing, district courts enjoy substantial discretion in deciding whether to impose a fine, determining the amount to impose, and fashioning terms of repayment.  See Gall v. United States, 552 U.S. at 49 ("[An] abuse-of-discretion standard of review applies to appellate review of all sentencing decisions -- whether inside or outside the Guidelines range.").  The Courts of Appeals review these decisions deferentially, reversing only for unreasonableness, which can be procedural or substantive.  "A sentence is procedurally unreasonable if the district court failed to calculate (or improperly calculated) the Guidelines range, treated the Guidelines as mandatory, failed to consider the § 3553(a) factors or failed to adequately explain the chosen sentence."  United States v. Middagh, 594 F.3d 1291, 1294 (10th Cir. 2010)(internal quotation marks omitted).  See United States v. Burgess, 576 F.3d 1078, 1101 (10th Cir. 2009)(internal quotation marks omitted).  "A sentence is substantively unreasonable if, considering the factors set forth in 18 U.S.C. § 3553(a), the sentence is unreasonable in length."

United States v. Ellis, 525 F.3d 960, 964 (10th Cir. 2008).  The Tenth Circuit affords sentences within the properly calculated Guidelines range with a rebuttable presumption of reasonableness, see United States v. Kristl, 437 F.3d at 1054, but that presumption is strictly for the appellate courts; district courts must fashion a sentence that incorporates all of the statutory factors, including the Guidelines range, see 18 U.S.C. § 3553(a)(4)(A) (directing courts to consider "the sentencing range . . . set forth in the guidelines"), but not limited to it or reliant on it to properly reflect the other factors, see United States v. Conlan, 500 F.3d at 1169 (holding that it is "error for the district court to apply the appellate presumption of reasonableness to the advisory guidelines when sentencing" (citing Rita v. United States, 551 U.S. 338 (2007))).

### 3.    The Fine Must Not Be Constitutionally Excessive.

There are two inquiries associated with a constitutional excessive-fine analysis.  First, the appellate court will inquire whether and how much of the fine is "punitive" rather than "remedial."   United States v. Bajakajian, 524 U.S. 321, 331-32 (1998)("Bajakajian").   Only punitive fines -- or the punitive portions of part-remedial, part-punitive fines -- are subject to the Excessive Fines Clause; to the extent that part of the fine has a valid remedial justification, the courts will subtract that portion of the fine and analyze the punitive portion as if it was the only monetary sanction imposed.  Bajakajian, 524 U.S. at 331-32 & n.6; Austin v. United States, 509 U.S. 602, 621-22 (1993)("[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term."  (quoting United States v. Halper, 490 U.S. 435, 448 (1989))(emphasis and alteration in Austin v. United States but not in United States v. Halper)).

a.      **Remedial Versus Punitive Monetary Sanctions.**

Whether and to what extent a fine is "remedial" depends upon the facts of the case and not on the legal label assigned to the monetary sanction.  Although labels can be instructive, because they tend to correlate to certain purposes -- "restitution" is almost always remedial, "civil in rem forfeitures" are typically remedial, and "fines" are typically punitive -- courts cannot rely on these labels and must make their own determinations about the nature of the sanction.  Austin v. United States, 509 U.S. 602, 618 (1993).  To be clear, in the same way that a general assessment on a populace can be a tax for constitutional purposes and a non-tax for statutory purposes, see Nat'l Federation of Indep. Business v. Sebelius, 132 S. Ct. 2566, 2594 (2012)("[T]he Act describes the payment as a 'penalty,' not a 'tax.'  But while that label is fatal to the application of the Anti-Injunction Act, it does not determine whether the payment may be viewed as an exercise of Congress's taxing power."  (citation omitted)), a government-imposed[20] monetary sanction, however labeled, is a "fine" under the Excessive Fines Clause only to the extent that it is punitive, Bajakajian, 524 U.S. at 331-32 & n.6.  Statutory civil forfeitures, special assessments, and, even, theoretically, restitution could all be constitutional fines, while statutory fines could, likewise, fall outside of the Clause's scope.  See supra note 20.

It is not entirely clear what the term "remedial" means in the excessive-fines context.  The Supreme Court appears, however, to have given the term a much narrower definition than it

---

[20]The "Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 260 (1989)(holding that the Clause "limit[s] only those fines directly imposed by, and payable to, the government").  Interestingly, the Clause can apply to restitution -- which, obviously, like punitive damages and unlike most fines, ultimately goes to a private party and not to the government.  See Paroline v. United States, 134 S. Ct. 1710, 1726 (2014)("The primary goal of restitution is remedial or compensatory, but it also serves punitive purposes.  That may be 'sufficient to bring [it] within the purview of the Excessive Fines Clause.'"  (citations omitted)).

has in everyday use.  Two cases, both at the Supreme Court level, speak to this issue; in <u>Austin</u>

<u>v. United States</u>, the Supreme Court wrote:

> We turn next to consider whether forfeitures under 21 U.S.C. §§ 881(a)(4) and (a)(7) are properly considered punishment today.  We find nothing in these provisions or their legislative history to contradict the historical understanding of forfeiture as punishment.  Unlike traditional forfeiture statutes, §§ 881(a)(4) and (a)(7) expressly provide an "innocent owner" defense.  These exemptions serve to focus the provisions on the culpability of the owner in a way that makes them look more like punishment, not less.  In <u>United States v. United States Coin & Currency</u>, 401 U.S. 715 (1971), we reasoned that 19 U.S.C. § 1618, which provides that the Secretary of the Treasury is to return the property of those who do not intend to violate the law, demonstrated Congress' intent "to impose a penalty only upon those who are significantly involved in a criminal enterprise."  The inclusion of innocent-owner defenses in §§ 881(a)(4) and (a)(7) reveals a similar congressional intent to punish only those involved in drug trafficking.
>
> Furthermore, Congress has chosen to tie forfeiture directly to the commission of drug offenses.  Thus, under § 881(a)(4), a conveyance is forfeitable if it is used or intended for use to facilitate the transportation of controlled substances, their raw materials, or the equipment used to manufacture or distribute them.  Under § 881(a)(7), real property is forfeitable if it is used or intended for use to facilitate the commission of a drug-related crime punishable by more than one year's imprisonment.
>
> The legislative history of § 881 confirms the punitive nature of these provisions.  When it added subsection (a)(7) to § 881 in 1984, Congress recognized "that the traditional criminal sanctions of fine and imprisonment are inadequate to deter or punish the enormously profitable trade in dangerous drugs."  It characterized the forfeiture of real property as "a powerful deterrent."
>
> The Government argues that §§ 881(a)(4) and (a)(7) are not punitive but, rather, should be considered remedial in two respects.  First, they remove the "instruments" of the drug trade "thereby protecting the community from the threat of continued drug dealing."  Second, the forfeited assets serve to compensate the Government for the expense of law enforcement activity and for its expenditure on societal problems such as urban blight, drug addiction, and other health concerns resulting from the drug trade.
>
> In our view, neither argument withstands scrutiny.  Concededly, we have recognized that the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society.  The Court, however, previously has rejected the government's attempt to extend that reasoning to conveyances used to transport illegal liquor.  In that case it noted: "There is nothing even remotely criminal in possessing an automobile."  The

same, without question, is true of the properties involved here, and the Government's attempt to characterize these properties as "instruments" of the drug trade must meet the same fate as Pennsylvania's effort to characterize the 1958 Plymouth sedan as "contraband."

The Government's second argument about the remedial nature of this forfeiture is no more persuasive. We previously have upheld the forfeiture of goods involved in customs violations as "a reasonable form of liquidated damages." But the dramatic variations in the value of conveyances and real property forfeitable under §§ 881(a)(4) and (a)(7) undercut any similar argument with respect to those provisions. The Court made this very point in Ward: The "forfeiture of property . . . [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law."

509 U.S. at 619-22 (citations omitted). This passage suggests a reading of "remedial" so circumscribed as to strain its plain meaning, which is that a monetary sanction is not remedial if it is based on a finding that the defendant did something wrong.

The Supreme Court's next case, Bajakajian -- which has become the seminal case construing the Excessive Fines Clause -- did nothing to backtrack from Austin v. United States, and may have even narrowed further the concept of remedial. Bajakajian involved a defendant's conviction for taking $357,144.00 out of the country without authorization, which is required for amounts of more than $10,000.00. See Bajakajian, 524 U.S. at 324. Upon the defendant's conviction, the United States sought to keep the whole $357,144.00, which the Supreme Court ruled would violate the Excessive Fines Clause:

The Government specifically contends that the forfeiture of respondent's currency is constitutional because it involves an "instrumentality" of respondent's crime. According to the Government, the unreported cash is an instrumentality because it "does not merely facilitate a violation of law," but is "'the very sine qua non of the crime.'" The Government reasons that "there would be no violation at all without the exportation (or attempted exportation) of the cash."

Acceptance of the Government's argument would require us to expand the traditional understanding of instrumentality forfeitures. This we decline to do. Instrumentalities historically have been treated as a form of "guilty property" that can be forfeited in civil in rem proceedings. In this case, however, the Government has sought to punish respondent by proceeding against him

> criminally, in personam, rather than proceeding in rem against the currency. It is therefore irrelevant whether respondent's currency is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination.

Bajakajian, 524 U.S. at 333 (citations omitted). The Supreme Court also noted that, while the instrumentality theory retains its vitality -- although apparently only in in rem proceedings[21] -- the money that the defendant was attempting to smuggle out of the country was not an instrumentality of his crime:

> Although the term "instrumentality" is of recent vintage, it fairly characterizes property that historically was subject to forfeiture because it was the actual means by which an offense was committed. "Instrumentality" forfeitures have historically been limited to the property actually used to commit an offense and no more. A forfeiture that reaches beyond this strict historical limitation is ipso facto punitive and therefore subject to review under the Excessive Fines Clause.
>
> . . . .
>
> The currency in question is not an instrumentality in any event. The Court of Appeals reasoned that the existence of the currency as a "precondition" to the reporting requirement did not make it an "instrumentality" of the offense. We agree; the currency is merely the subject of the crime of failure to report. Cash in a suitcase does not facilitate the commission of that crime as, for example, an automobile facilitates the transportation of goods concealed to avoid taxes. In the latter instance, the property is the actual means by which the criminal act is committed. See Black's Law Dictionary 801 (6th ed. 1990)("Instrumentality" is "[s]omething by which an end is achieved; a means, medium, agency").

Bajakajian, 524 U.S. at 333 nn.8-9 (citations omitted). The Court interprets this final paragraph narrowly. While $357,144.00 in cash may not be an instrumentality, because it is legal to

---

[21]Although both Austin v. United States and Bajakajian use the historical practice of in rem forfeitures of "guilty property" to illustrate when a sanction is remedial, the former case explicitly held that "forfeiture generally and statutory in rem forfeiture in particular historically have been understood, at least in part, as punishment." Austin v. United States, 509 U.S. at 618 (footnote omitted). Thus, although the block-quoted passage of Bajakajian, taken out of context, appears to imply that the procedural posture of the forfeiture suit -- in rem versus in personam -- is outcome dispositive whether the resultant forfeiture is a fine for Eighth Amendment purposes, that result is not the case.

possess, carry around, and use -- just not to take out of the country -- the Court concludes that a large quantity of, e.g., methamphetamines, would not be.  To conclude otherwise would lead to the absurd result that confiscation of large quantities of illegal drugs could -- if the drugs were valuable enough and especially if the defendant's culpability was relatively low, e.g., a mule -- violate the Excessive Fines Clause.

> ### b.    The Requirement of Proportionality for Punitive Monetary Sanctions.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." Bajakajian, 524 U.S. at 334 (citing Austin v. United States, 509 U.S. at 622-23).  The proportionality inquiry is, as it sounds, a somewhat loose one.  It is also, rightly, deferential to both the district court's on-the-ground determinations and, more importantly, to Congress' decisions about what crimes should receive what penalties.  "[I]f the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional."[22]  United States v. 817 N.E. 29th Dr., 175 F.3d 1304, 1309 (11th Cir. 1999).

Beyond that deference to the legislature, the Supreme Court has outlined factors for the courts to consider when determining whether a fine is excessive, and the Tenth Circuit has supplemented those factors:

> [T]he [Supreme] Court examine[s] several factors.  One of the most important [i]s Congress's judgment about the appropriate punishment for the owner's offense.  Maximum statutory fines provide guidance on the legislative view of the seriousness of the offense.   The fines set out in the sentencing guidelines, promulgated by the United States Sentencing Commission, are another way of

---

[22]The Excessive Fines Clause's point, of course, is that it limits -- rather than trusts -- the government's discretion to levy large fines.  This presumption of validity raises the question whether the Clause's primary purpose is to cabin (i) the legislatures' authority to set fines; or (ii) the trial courts' authority to impose them.

"[t]ranslating the gravity of a crime into monetary terms."  Additional factors for consideration of the gravity of the offense include the extent of the criminal activity, related illegal activities, and the harm caused to other parties.

. . . .

[W]e must supplement the factors discussed by the Supreme Court.  As we explained in United States v. 829 Calle De Madero, 100 F.3d 734 (10th Cir. 1996), a case decided before Bajakajian, a proportionality analysis is "factually intensive," so that a catalog of factors is not "necessarily exclusive." Like Ms. Lees, the owner in 829 Calle De Madero challenged the constitutionality of a residential forfeiture under § 881(a)(7).  We stated that

> [i]n evaluating proportionality, courts must compare the severity of the offense with which the property was involved, the harshness of the sanction imposed, and the culpability of the claimant.  Relevant factors in assessing the harshness of the sanction include the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the sovereign seeking forfeiture. Against these factors, the severity of the offense must be evaluated, taking into account the extent of both the claimant's and the property's role in the offense, the nature and scope of the illegal operation at issue, the personal benefit reaped by the claimant, the value of any contraband involved in the offense, and the maximum sanction Congress has authorized for the offense.

Thus, in addition to the Bajakajian factors, we suggested other considerations: the general use of the forfeited property, any previously imposed federal sanctions, the benefit to the claimant, the value of seized contraband, and the property's connection with the offense.  Bajakajian in no way undermines the relevance of these factors in a proportionality analysis for a forfeiture proceeding . . . .

United States v. Wagoner Cty. Real Estate, 278 F.3d 1091, 1100-01 (10th Cir. 2002)(footnote

omitted)(citations omitted).

Both the Supreme Court and the Tenth Circuit left open an important question: whether

the defendant's financial condition is relevant to the Excessive Fines Clause proportionality

analysis, i.e., whether a given dollar-value fine for a given offense will be analyzed the same

whether the defendant is a billionaire or a pauper.  The Supreme Court speaks only of

"compar[ing] the amount of the forfeiture to the gravity of the defendant's offense," Bajakajian,

524 U.S. at 336-37 (emphasis added), and, while the Tenth Circuit refers to the "harshness of the sanction" -- which would seem to depend on the fine's effect on the specific defendant involved -- it defines the term, rather thoroughly, without reference to the defendant's wealth: "Relevant factors in assessing the harshness of the sanction include the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the sovereign seeking forfeiture," United States v. Wagoner Cty. Real Estate, 278 F.3d at 1101 (quoting United States v. 829 Calle De Madero, 829 F.3d at 738).

In fact, given the number of factors that United States v. Wagoner County Real Estate sets forth as relevant to the proportionality analysis, the omission of even the slightest reference to the defendant's financial state or the fine's impact on the specific defendant was almost certainly intentional. The Tenth Circuit repeatedly states that its factors are non-exclusive, and it certainly never comes out and explicitly states that the defendant's wealth is irrelevant, so this omission may be more about avoiding the question than suggesting a negative answer to it. The Supreme Court was clearer about basing its failure to engage this issue on avoidance. In a footnote -- which was more-or-less apropos of nothing written above the line -- placed toward the end of its Bajakajian opinion, the Supreme Court wrote: "Respondent does not argue that his wealth or income are relevant to the proportionality determination or that full forfeiture would deprive him of his livelihood, and the District Court made no factual findings in this respect." 524 U.S. at 340 n.15 (citation omitted). Whether the Excessive Fines Clause considers the defendant's financial resources -- i.e., whether the fine's magnitude as a percentage of the defendant's assets matter, or just the absolute magnitude, and whether the financial state in

which payment of the fine will leave the defendant is relevant[23] -- remains an open question, although there is nothing, except perhaps common sense, to suggest that it does.[24]

---

[23]There are, theoretically, three broad ways to define the "amount" or "harshness" of a fine.  The first is simply the fine's absolute magnitude, i.e., the number behind the dollar sign.  This definition does not take into account the defendant's resources at all.  The second is the fine's magnitude as a percentage of the defendant's overall wealth, liquid assets, income, or disposable income.  Although this definition is really several definitions -- as the fine can be based on wealth, income, or a subset of either -- they all relate to an "absolute proportion" of the defendant's resources, i.e., they all refer, in the end, to the number in front of the percentage sign.  The third way of defining the harshness or amount of a fine focuses on the real diminution in quality of life that the fine is likely to impose on the defendant.  A fine of a set percentage of income or wealth will not necessarily produce the same average diminution in quality of life across defendants of all levels of income or wealth.  A defendant making $1,000,000.00 per year could likely weather a 50-percent-of-total-income fine much more comfortably than a defendant making $20,000.00 per year, even though the two fines, as a fraction of income, are the same, and the millionaire's fine is much greater in terms of absolute magnitude.  This concept -- known in economic parlance as diminishing marginal utility -- underlies the United States' system of progressive income taxation.

[24]The defendant's financial condition is at least indirectly built into the constitutional excessive-fines analysis.  Both the federal fine statute and the fine guideline direct courts to consider the defendant's resources, see 18 U.S.C. § 3572(a)(1)-(2) (directing courts to consider "the defendant's income, earning capacity, and financial resources," and "the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose"); U.S.S.G. § 5E1.2(d)(2)-(3) (directing courts to consider "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources," and "the burden that the fine places on the defendant and his dependents relative to alternative punishments"), and imposition in keeping with the legislature's mandates is both necessary and sufficient for a fine to receive a "strong presumption" of constitutionality, United States v. 817 N.E. 29th Dr., 175 F.3d at 1309.

Concluding that the defendant's financial state is pertinent to the fine statute and compliant with the fine statute is part of the constitutional analysis, however, is not the same as determining that the defendant's financial state being directly built into the constitutional analysis, for two reasons.  First, statutory compliance goes only to the binary determination whether the fine is afforded a presumption of constitutionality; it is unclear whether failure to take defendant-specific hardships into account can render a presumptively valid fine unconstitutional, or whether such consideration is necessary or helpful to render a fine without a presumption of constitutionality nonetheless valid.  It is important to bear in mind that, while a statutorily proper fine is presumptively constitutional, there is no indication that a statutorily excessive fine is presumptively unconstitutional.  Second, the federal fine statute and fine guideline may not apply in all cases, for all time.  Congress can amend the federal statute or

In contrast to the deferential abuse-of-discretion standard under which the Court of Appeals reviews fines for statutory reasonableness, whether a fine is constitutionally excessive is reviewed de novo.  See Bajakajian, 524 U.S. at 337 & n.10.  Although the nominal standard of review under the Excessive Fines Clause is high, the Clause's substance effectively builds deference into the review: despite being de novo, the Court of Appeals will reverse a district court's imposition of a fine only if the fine is "grossly disproportional to the gravity of [the] offense" and not if it is merely "too high."  Bajakajian, 524 U.S. at 339-40.  See id. at 336 ("[A]ny judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise[, which] counsel[s] against requiring strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense, and we therefore adopt the standard of gross disproportionality.").

## ANALYSIS

The Court will deny Valencia's request for a mitigating role reduction under U.S.S.G. § 3B1.2 and a two-level familial relationship reduction under § 2D1.1(b)(16).  The Court will not grant Valencia a minimal or minor role adjustment under § 3B1.2, because there is no sound evidence that he is plainly among the least culpable of those involved in the C. Roybal DTO or less culpable than the average participant in the C. Roybal DTO.  Additionally, because the Court has concluded that Valencia is not entitled to a 4-level minimal participant reduction under § 3B1.2(a), he is ineligible for a familial relationship reduction under U.S.S.G. § 2D1.1(b)(16).  The Court will also deny Valencia's request for a downward variance from the advisory guideline range in light of the § 3553(a) factors.  The Court will impose a fine of $99,801.98,

---

guideline at any time.  Also, the Excessive Fines Clause is likely incorporated against the states, see supra note 12, and state fine statutes need not mirror the federal statute's provision for defendant-specific inquiries.

payable at the rate of at least $625.00 per month.  This fine is well below the statutory maximum of $1,000,000.00 per count, see 18 U.S.C. § 3571(b), and within the guidelines range of $7,500.00 to $1,000,000.00, see U.S.S.G. § 5E1.2(c)(4).  Valencia, with his assets and earning capacity, should help defray the costs of his incarceration and supervised release.   After considering the fourteen applicable factors, see supra Law Regarding Imposition of Criminal Fines, Part 2 (The Court Must Then Consult the Statutory Factors), the Court concludes that it should impose a fine equivalent to the costs of Valencia's incarceration and supervised release. Finally, the Court denies Valencia's Motion to Reduce Sentence, filed May 5, 2015 (Doc. 893), because only the United States may invoke rule 35(b) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3573, and 28 U.S.C. § 2255 is not available to Valencia because the Court does not construe Valencia's Motion to Reduce Sentence as brought under 28 U.S.C. § 2255.

## I.     THE COURT WILL NOT APPLY A MITIGATING ROLE REDUCTION UNDER U.S.S.G. § 3B1.2.

U.S.S.G. § 3B1.2 authorizes courts to reduce a defendant's offense level if the defendant was a minimal or minor participant in an offense.  See U.S.S.G. § 3B1.2.  U.S.S.G. § 3B1.2 provides in full:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (c) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (d) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>
> In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.  Application note 3 indicates that this guideline "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant."  U.S.S.G. § 3B1.2 cmt. n. 3(A).

Application note 3 further confirms that a court's task in determining the application of this guideline is highly fact-based: "The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2. cmt. n. 3(C). Subsection (a) regarding minimal participants covers defendants who are "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2. cmt. n. 4. "Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. § 3B1.2. cmt. n. 4. Subsection (b) covers a defendant who "is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2. cmt. n. 5.

This criminal organization was relatively complex, and the United States charged a total of nineteen co-Defendants in this case. See Superseding Indictment at 1-10; PSR at 2. Valencia's drug trafficking conduct does not appear to have been an isolated incident. Rather, the evidence indicates, by a preponderance of the evidence, that Valencia was someone more experienced with drug trafficking than this single incident. Sources of supply are essential in drug trafficking. The Court does not say that a source can categorically never get a minimal or minor role adjustment, but they have a more difficult task than individuals at the other end of the distribution chain, who may be couriers or other low-level employees. That Valencia himself had a source -- whether it be Big Joe or somebody else -- does not undercut the fact that Valencia was a source of cocaine supply for C. Roybal, a major drug distributor in New Mexico. The Court is persuaded, by a preponderance of the evidence, that Valencia knew that others would be at the other end of this distribution channel. The Court does not find, by a preponderance of the

evidence, that Valencia is "plainly among the least culpable of those involved in the conduct of a group," U.S.S.G. § 3B1.2. cmt. n. 4, or "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal," U.S.S.G. § 3B1.2. cmt. n. 5. The Court thus denies Valencia's request for a 4-level minimal participant or 2-level minor participant role reduction under U.S.S.G. § 3B1.2.

## II. THE COURT WILL DENY VALENCIA'S REQUEST FOR A 2-LEVEL REDUCTION UNDER § 2D1.1(b)(16).

U.S.S.G. § 2D1.1(b)(16) establishes:

(16)  If the defendant receives the **4**-level ("minimal participant") reduction in § 3B1.2(a) and the offense involved all of the following factors:

    (A)  the defendant was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense;

    (B)  the defendant received no monetary compensation from the illegal purchase, sale, transport, or storage of controlled substances; and

    (C)  the defendant had minimal knowledge of the scope and structure of the enterprise.

decrease by **2** levels.

U.S.S.G. § 2D1.1(b)(16) (bold in original). Here, the Court has concluded that "the 4-level ('minimal participant') reduction in § 3B1.2(a)" is not warranted. U.S.S.G. § 2D1.1(b)(16) therefore does not apply to this case, and Valencia is not entitled to an additional 2-level reduction pursuant to U.S.S.G. § 2D1.1(b)(16). The Court therefore denies Valencia's request for a familial relationship reduction under § 2D1.1(b)(16).

## III. THE COURT WILL NOT VARY FROM THE GUIDELINE SENTENCING RANGE.

Valencia's total offense level under the guidelines is 21, his criminal history category is I, and his sentencing range, therefore, is 37-46 months. The Court will not vary downward from

the guidelines range to fashion a sentence that is sufficient, but not greater than necessary, to

comply the following purposes:

   **(A)**     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   **(B)**     to afford adequate deterrence to criminal conduct;

   **(C)**     to protect the public from further crimes of the defendant; and

   **(D)**     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
. . .

18 U.S.C. § 3553(a)(2).  In tailoring a sentence to meet these ends, the Court must consider "the

nature and circumstances of the offense and the history and characteristics of the defendant."

18 U.S.C. § 3553(a)(1).

     The Court has identified six factors that put downward pressure on Valencia's sentence.

First, the Court has read the letters sent to it on Valencia's behalf and considered Valencia's

work history, and it concludes that Valencia has a very loyal family that cares deeply about him.

People think highly of Valencia as an employee, rancher, and member of the greater Las Vegas

community.  Second, the need to provide just punishment also puts downward pressure on the

sentence, although, as subsequently explained, it can also put upward pressure on the sentence

because of the seriousness of the crime.  Third, the public needs less protection from Valencia

than it needs from someone who the Court is convinced might recidivate.  Other than DWIs, he

does not have anything approaching a crime of violence.  Fourth, supervised release can go a

long way in serving as an alternative to longer imprisonment; it may be that the Court can

substitute supervised release for incarceration, and use supervised release to deal with Valencia's

problems.  Fifth, the overall desire to have a reasonable sentence puts downward pressure on the

sentence.  Sixth, the need for the sentence to not be greater than necessary puts downward pressure on the sentence.

There are, however, eight factors that put upward pressure on the sentence and suggest that the Court should remain in the guidelines range: (i) this is a serious offense involving large amounts of drugs in a community that is wrestling with cocaine and heroin problems; (ii) the sentence must promote respect for the law; (iii) the need to provide just punishment because of the seriousness of the crime; (iv) the sentence must afford adequate deterrence at the specific level so that Valencia does not engage in drug activity again, and afford general deterrence to deter people from engaging in this activity; (v) although the Court is less concerned that Valencia might recidivate, the public must be protected from this drug trafficking activity; (vi) the need to avoid unwarranted sentencing disparities among defendants with similar records involving similar conduct, plus the need to be consistent with other sentences the Court has given to Valencia's co-defendants, puts pressure on the Court to stay within the guidelines range; (vii) the overall desire to have a reasonable sentence; and (viii) the need for the sentence to be sufficient.

On balance, the Court concludes that the factors that put upward pressure on the sentence to stay in the guidelines range outweigh those that put downward pressure on the sentence.  In sum, the circumstances weigh in favor of staying within the guidelines range.  The Court sentences Valencia to a term of incarceration at the low end of the guidelines range, 37-months imprisonment, followed by three years of supervised release.

## IV.   **THE COURT WILL IMPOSE A FINE OF $99,801.98.**

The Court will impose a fine of $99,801.98.  The fine will be payable at the rate of at least $625.00 per month.  This fine is well below the statutory maximum of $1,000,000.00 per

count, see 18 U.S.C. § 3571(b), and within the guidelines range of $7,500.00 to $1,000,000.00, see U.S.S.G. § 5E1.2(c)(4).   After considering the fourteen applicable factors, see supra Law Regarding Imposition of Criminal Fines, Part 2 (The Court Must Then Consult the Statutory Factors), the Court concludes that it should impose a fine equivalent to the costs of Valencia's incarceration and supervised release.

### A.   THERE ARE GOOD REASONS FOR IMPOSING A FINE.

Valencia pled guilty to "a one-count Information, charging a violation of 21 U.S.C. § 846, that being Conspiracy to Distribute Cocaine."  Plea Agreement at 1.  Congress, by enacting the federal drug statutes, made it clear that federal courts must take drug offenses -- and drug trafficking in particular -- very seriously.  There is a large amount of drugs in the community, which is currently wrestling with a heroin and cocaine problem.  The Albuquerque Journal recently reported that more New Mexicans died of drug overdoses in 2014 than in any other year on record.  See Christopher Ingraham, Marijuana is the least of the nation's drug worries, officers say, ALBUQUERQUE JOURNAL, Nov. 6, 2015, at C10.  The political branches have ordered the Court to punish and prevent the sort of large-scale drug trafficking in which Valencia engaged.  Moreover, the Court thinks that it is particularly appropriate when dealing with drug trafficking to use fines because the reason that drug traffickers are in the business to begin with is the money.

The Court has imposed a sentence of 37-months incarceration, which is at the low end of Valencia's guidelines range of 37 to 46 months.  Valencia presents an unusual picture as a defendant.  Unlike many defendants that appear before the Court, Valencia otherwise presents a somewhat unique image.  Although he did not finish high school, Valencia has always been well employed as a heavy equipment operator and ranch operator.  He makes good money by New

Mexico standards.  He has trained horses, participated in professional roping competitions, and has been featured in magazines.  Valencia has worked for most of his life, and amassed $6,000.00 in cash, a $100,000.00 investment account, a horse trailer valued at $4,000.00, and eight horses valued at $15,000.00.  Material possessions, it seems, have meaning to him.  Losing some of these possessions, especially the horses, will promote respect for the law and deter him from similar behavior in the future.  The Court is acutely aware that Valencia is the primary caretaker for his parents and that his daughter -- Alyssa, a single mother -- is dependent on him in many ways.  See PSR ¶ 72, at 18.  Criminal activity often -- usually, indeed -- has sad consequences for family members, including parents and children.  This case is no different.

The Court must punish drug trafficking severely.  Given Valencia's unique circumstances -- available employment, skills, assets -- it makes more sense to squeeze him a little financially.  Given that he can sell some of his existing assets, he should be able to pay the fine.  The reality is that the sentence with a fine better reflects the seriousness of the offense, promotes respect for the law, provides just punishment, offers adequate deterrence, both at a general and specific level, and protects the public that a sentence without a fine.  That the Court chose a sentence at the low end of the guidelines range plus a fine serves the guidelines' purposes well, because of Valencia's unique circumstances.

Perhaps most important in deciding whether a fine is appropriate, Valencia has also cost the United States, the USPO, and the Court a lot of time and energy, and has cost the taxpayers a lot of money.  See U.S.S.G. § 5E1.2(d)(7); 18 U.S.C. § 3572(a)(6).  His incarceration will cost the country at least $90,315.89 when all is said and done, and his supervised release will then

soak up another $9,486.09.[25]  See 18 U.S.C. § 3572(a)(6) (directing district courts to consider "the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence"); U.S.S.G. § 5E1.2(d)(7) (same); PSR ¶ 121, at 25 (listing the Administrative Office of the Courts' current estimates of costs of prosecution at $2,440.97 per month while the defendant is housed in a BOP facility and $263.50 per month while he or she is on supervised release).  U.S.S.G. § 5E1.2(d)(7) establishes that in determining the amount of the fine, the Court shall consider, among other factors, "the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed."  U.S.S.G. § 5E1.2(d)(7).  Section 3572(a)(6) of Title 18 of the United States Code similarly states that in determining whether to impose a fine, and the amount, time for payment, and method of payment

---

[25]The most recent advisory from the Administrative Office of the United States Courts, dated June 24, 2014, lists the following monthly cost data:

| | Bureau of Prison Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $80.25 | $72.91 | $8.66 |
| Monthly | $2,440.97 | $2,217.73 | $263.50 |
| Annually | $29,291.62 | $26,612.76 | $3,162.03 |

PSR ¶ 121, at 25.

The Court has imposed a sentence of 37-months incarceration and three years of supervised release.  The Court has determined the total cost of Valencia's incarceration and supervised release to be $99,801.98 based upon the following calculations:

> Incarceration: 37 months x $2,440.97 (prison monthly rate) = $90,315.89
>
> Supervised Release: 3 years x $3,162.03 (supervision yearly rate) = $9,486.09
>
> **Total Cost: $90,315.89 + $9,486.09 = $99,801.98**

PSR ¶ 121, at 25.

of a fine, the Court shall consider, among other things, "the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence."  18 U.S.C. § 3572(a)(6).  Valencia has sufficient assets to pay the fine immediately, given that his assets, overall, are worth $230,000.00.  See PSR ¶¶ 105-08, at 23; April Tr. at 32:9-33:8.  This fine is not unreasonable, nor is it excessive.  Indeed, this estimate may be conservative; if the Court were to go with Valencia's son's estimate of the value of his horses[26] -- $50,000.00 to $100,000.00 each -- Valencia's total net worth would range between $510,000.00 and $910,000.00.  In sum, the Court concludes that there are good reasons to impose a fine equivalent to the costs of Valencia's incarceration and supervised release -- $99,801.98 -- and that the fine will be payable at the rate of at least $625.00 per month.

> ### B.      VALENCIA DID NOT PROVE, BY A PREPONDERANCE OF THE EVIDENCE, THAT HE IS UNABLE TO PAY A FINE.

Under the guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added).  Valencia has the burden of proving that he cannot afford to pay a fine, and he has not met this burden of proof.  He owns (i) a personal checking account with $4,000.00; (ii) a personal checking account with $2,000.00; (iii) a $100,000 contract with Edward Jones Investments which comprises part of his stable income ($700 per month); (iv) a "1997 Horse Trailer" worth $4,000.00; and (v) eight horses valued at $15,000.00 each.  He is in a far stronger financial position than many other defendants which the Court has sentenced.

---

[26]The originally disclosed PSR states that Martin reported, "[t]he defendant also trained horses that, after a couple of years, became valued at $50,000 to $100,000 each."  PSR ¶ 97, at 21.  According to the First Addendum, however, "[t]he defendant stated his son does not have any knowledge of horses, and indicated the horses are currently worth approximately $15,000 to $20,000 each."  First Addendum 2.  Later, at Valencia's sentencing hearing, the Court opted to "take the low end of 15,000," resulting in net value of $120,000.00 in horses.  April Tr. at 32:9-33:8 (Court, McKeivier).

Once the Court decided that -- given his assets and other factors -- it would fine Valencia, the burden shifted to Valencia to prove he could not afford to pay that fine. He has not offered any evidence that he could not pay the proposed fine. While the difficulty a fine will cause is certainly relevant when he is arguing that the Court should not impose a fine, it is not relevant once the Court decides to impose a fine. At that stage, difficulty to the defendant is not the issue; the sole issue is whether he can pay the fine. Indeed, the evidence available supports the Court's finding, by a preponderance of the evidence, that he can pay the fine by selling some of his assets -- such as his horses -- or taking out a loan equivalent to their value.

## V.      THE COURT WILL DENY VALENCIA'S MOTION TO REDUCE SENTENCE.

The Court denies Valencia's motion to reduce his sentence under rule 35(b) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3573. Only the United States, and not a defendant, can move to reduce a sentence under that rule and statute. Further, the Court denies Valencia's motion to reduce his sentence under 28 U.S.C. § 2255, because the Court does not construe Valencia's Motion to Reduce Sentence as brought under 28 U.S.C. § 2255.

### A.      THE COURT DENIES VALENCIA'S MOTION TO REDUCE HIS SENTENCE UNDER RULE 35(b) and 18 U.S.C. § 3573.

The Court agrees with the United States that the Court may not reduce Valencia's sentence under either rule 35(b) or 18 U.S.C. § 3573 unless the United States moves for that reduction. Rule 35(b) provides:

**(b) Reducing a Sentence for Substantial Assistance.**

**(1) In General.** Upon the government's motion made within one year of sentencing, the court may reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person.

**(2) Later Motion.** Upon the government's motion made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved:

**(A)** information not known to the defendant until one year or more after sentencing;

**(B)** information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing; or

**(C)** information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant.

**(3) Evaluating Substantial Assistance.**  In evaluating whether the defendant has provided substantial assistance, the court may consider the defendant's presentence assistance.

**(4) Below Statutory Minimum.**  When acting under Rule 35(b), the court may reduce the sentence to a level below the minimum sentence established by statute.

Fed. R. Crim. P. 35(b).  While 35(b) allows for the United States to move to reduce a sentence under certain circumstances, it does not provide defendants with such a right.  The Court agrees with the United States that "Rule 35(b) may only be invoked by the United States, not the defendant."  Response to MTR at 1 (citing United States v. Blackwell, 81 F.3d at 945).  This interpretation of rule 35(b) is consistent with the Court's prior rulings, see United States v. Myers, 375 F. Supp. 2d at 1298, as well as decisions of the Tenth Circuit, see United States v. Blackwell, 81 F.3d at 945.  The Court explained in United States v. Myers:

The Court, in the exercise of its equitable powers, is not free to ignore the requirements that Congress has set forth before the district court can exercise that discretion.  *United States v. Blackwell*, 81 F.3d at 946 ("Congress has authorized the federal courts to modify a sentence only in limited circumstances.  [If] no congressional enactment authorize[s] the court to modify Defendant's sentence in the instant case, the court [will] lack [] jurisdiction to do so.").

Moreover, the Court cannot modify Myers' sentence pursuant to rule 35(a) because Myers filed his motion almost one year after the Court sentenced him and entered final judgment.  Likewise, rule 35(b) cannot serve as the basis of this Court's jurisdiction, because a modification under it must be made "[u]pon the

government's motion."   The United States has not moved for a reduction for substantial assistance and has expressed its opposition to Myer's motion.   Thus, rule 35(b) does not apply.

375 F. Supp. 2d at 1298.

In United States v. Blackwell, the Tenth Circuit reversed the district court's re-sentencing of a co-defendant seventy-two days after the original sentencing.   See 81 F.3d at 946.   There, the defendant, who received an initial sentence of 15-months imprisonment, moved the court for a re-sentencing, because "three days prior to his sentencing, Defendant's supplier pleaded guilty to distributing fifty-five ounces of cocaine and the United States District Court for the District of Utah sentenced her to probation." 81 F.3d at 946.   The district court held a re-sentencing hearing seventy-two days after the original sentencing and, at that hearing, reduced the defendant's sentence to "three-years probation, with six-months home detention."   See 81 F.3d at 947.   In explaining its authority to modify the defendant's sentence, the district court relied on "two alternative sources of authority . . . :(1) the court's 'inherent jurisdiction' to right injustices, and (2) Fed. R. Crim. P. 35[.]" 81 F.3d at 947.

The Tenth Circuit rejected the district court's reliance on rule 35, or its "inherent authority," concluding that "the court lacked jurisdiction to resentence Defendant."   81 F.3d at 949.   The Tenth Circuit first held that the only option under § 3582 applicable to that case was whether rule 35 granted the court authority to modify the defendant's sentence.   See 81 F.3d at 948.   Rule 35(a) did not apply, "because the court did not correct Defendant's sentence within seven days after the original sentence was imposed, but resentenced Defendant seventy-two days later." 81 F.3d at 948 (discussing then rule 35(c)).   Of more importance here, the Tenth Circuit also held that rule 35(b) did not apply: "Because subsection (b) applies only to motions made by the government, a defendant cannot invoke Rule 35(b) and empower the court to reduce his

- 103 -

sentence." 81 F.3d at 948.  See United States v. Corral, No. CR 05-0496 JB, 2006 WL 1308237, at *3 (D.N.M. Mar. 28, 2006)(Browning, J.)(denying motion to reconsider sentence based on argument that incarceration prevented defendant from earning a living, paying taxes, and supporting his children, stating that the Court lacks power to change the sentence).  In sum, in light of the Tenth Circuit's decision in United States v. Blackwell and the Court's own decisions addressing its powers under rule 35(b), the Court denies Valencia's request to reduce his sentence under rule 35(b) of the Federal Rules of Criminal Procedure.

The Court also concludes that it lacks the authority to reduce Valencia's sentence under 18 U.S.C. § 3573.  Section 3573 of Title 18 of the United States Code provides:

> Upon petition of the Government showing that reasonable efforts to collect a fine or assessment are not likely to be effective, the court may, in the interest of justice—
>
> (1) remit all or part of the unpaid portion of the fine or special assessment, including interest and penalties;
>
> (2) defer payment of the fine or special assessment to a date certain or pursuant to an installment schedule; or
>
> (3) extend a date certain or an installment schedule previously ordered.
>
> A petition under this subsection shall be filed in the court in which sentence was originally imposed, unless the court transfers jurisdiction to another court.  This section shall apply to all fines and assessments irrespective of the date of imposition.

18 U.S.C. § 3573.  The Court again agrees with the United States that, similar to rule 35(b) of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3573 applies only "[u]pon petition of the Government [that] show[s] that reasonable efforts to collect a fine or assessment are not likely to be effective."  18 U.S.C. § 3573.  In Valencia's case, there have been no attempts to collect a fine or assessment, and the United States has not petitioned the Court to waive any part of the fine.

**B.** **THE COURT DOES NOT CONSTRUE VALENCIA'S MOTION TO REDUCE HIS SENTENCE AS BROUGHT UNDER 28 U.S.C. § 2255.**

In Valencia's Motion to Reduce Sentence, he writes:

> Alternatively, if the court finds no jurisdiction under the foregoing authority, 28 U.S.C. § 2255 gives the prisoner authority to argue that the sentence was imposed in violation of the Constitution or laws of the United States including his right to effective assistance of counsel in reviewing the PSR and including in the sentence memorandum all relevant matters that were discussed by family and defendant.

Motion to Reduce at 3-4.  Valencia further states:

> In the event the court finds no jurisdiction to consider defendant's motion to reduce sentence, allow him leave to file a petition under . . . 28 U.S.C. § 2255 to review and rebut matters alleged in the PSR and to present matters not previously addressed in a supplemental pleading to this initial motion filed within the two week period[.]

Motion to Reduce at 4.  The Court agrees with Valencia that 28 U.S.C. § 2255's plain language does not preclude a defendant from filing a motion pursuant to § 2255 before the entry of final judgment.  Sections 2255(a) and (b) state:

> **(a)** A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

> **(b)** Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. §§ 2255(a)-(b) (bold in original).  Moreover, Section 2255(f) appears to be a statute of

limitations and not a bar to a defendant filing a § 2255 motion before final judgment is entered:

> **(f)** A 1-year period of limitation shall apply to a motion under this section. The
> limitation period shall run from the latest of --
>
>> **(1)** the date on which the judgment of conviction becomes final;
>>
>> **(2)** the date on which the impediment to making a motion created by
>> governmental action in violation of the Constitution or laws of the United
>> States is removed, if the movant was prevented from making a motion by
>> such governmental action;
>>
>> **(3)** the date on which the right asserted was initially recognized by the
>> Supreme Court, if that right has been newly recognized by the Supreme
>> Court and made retroactively applicable to cases on collateral review; or
>>
>> **(4)** the date on which the facts supporting the claim or claims presented could
>> have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f) (bold in original).

The Court does not, however, construe Valencia's Motion to Reduce Sentence as a

petition for relief under 28 U.S.C. § 2255.  Moreover, at the hearing on the Motion to Reduce

Sentence, Valencia conceded that he would need to file a formal petition under 28 U.S.C. §

2255:

> THE COURT: Here's what I'll probably do, though [--] not probably this is what
> I'll do.  I'm going to take your [] petition for habeas and refer it to a magistrate
> judge.
>
>> Now, the question is . . . if there is not going to be an appeal and you tell
> me that you don't really need the opinion to do your habeas case, that wouldn't be
> helpful.  I can get you a J & C entered th[is] afternoon and I . . . make the referral
> on the habeas case this afternoon as well.
>
> MR. AARONS: Yeah, if that's the fas[]test.
>
> THE COURT: That's the fastest.  You filed a petition, right?
>
> MR. AARONS: In essence, yeah, I filed a motion that cites to that statute.

THE COURT: Well, I think you're going to have to file a petition.

MR. AARONS: Right, I'm going to have to file a formal petition.

THE COURT: And I can refer that down so I can do that or this is what you may want and I'm not telling you how to run it, but you may want me to get the opinion out to you, you go ahead and file your petition, and the magistrate, as they're making their recommendations has [my] thoughts as to what I did. I'm going to write the opinion even if we hadn't had this hearing and read your stuff I'm going to write up what I did and why I did it. . . . [B]ut it seems to me we're barreling toward you filing a formal petition, me referring it to a magistrate Judge and the question is do you want it with my opinion here or I don't know are you going to try.

. . . .

THE COURT: What if I did this. This is a little bit unusual but I've done [it] before. What if I go ahead and enter judgment, and then you go ahead and file your petition, and I'll get the opinion out while you're doing your stuff and I do my stuff, and but it won't slow anything down. . . .

MR. AARONS: I think it will help really if we get a resentencing that we kind of know where we started.

. . . .

MR. AARONS: All right so I will file the petition[], the Court's going to file a J and S.

THE COURT: Well, do this. We'll file the judgment first, she'll go ahead and file it. We've got an understanding I'll get the opinion out to you.

MR. AARONS: Afterwards. Shortly afterwards.

THE COURT: Afterwards. And then you file your 2255, and that way we won't slow anything down and I'll make an immediate referral to the magistrate judge, and have that go. Does that sound like the best approach.

MR. AARONS: That's the best approach available, your Honor.

THE COURT: Okay.

Sept. Tr. at 5:4-8:3 (Aarons, Court). Pursuant to this arrangement, the Court subsequently

entered judgment, see Judgment, filed September 11, 2015 (Doc. 1053), and Valencia filed a

formal petition under 28 U.S.C. § 2255, see Motion Under 28 U.S.C. § 2255 to Vacate, Set

Aside, or Correct Sentence by a Person in Federal Custody, filed November 4, 2015 (Doc.

1066)("Motion Under 28 U.S.C. § 2255").  In sum, the Court does not construe Valencia's

Motion to Reduce Sentence, filed May 5, 2015 (Doc. 893), as brought under 28 U.S.C. § 2255;

rather, it considers his Motion Under 28 U.S.C. § 2255 to be his first motion brought under 28

U.S.C. § 2255.

**IT IS ORDERED** that the Court sentences Defendant Manuel Valencia to 37-months

imprisonment to be followed by three years of supervised release, a $99,801.98 fine payable in

monthly installments of $625.00, and $100.00 in special assessments.  Pursuant to the Plea

Agreement, Valencia will also pay a monetary judgment in the amount of $28,000.00.  The

Court also denies Valencia's Motion to Reduce Sentence, filed May 5, 2015 (Doc. 893).

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
  United States Attorney
Joel R. Meyers
Stephen R. Kotz
Shana B. Long
  Assistant United States Attorneys
United States Attorney's Office for the District of New Mexico
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Cynthia Marie Armijo
Armijo Law Firm
Albuquerque, New Mexico

--and--

- 108 -

Ashli Summer McKeivier
The Criminal Defense Group
North Hollywood, California

--and--

Stephen D. Aarons
Aarons Law Firm PC
Santa Fe, New Mexico

*Attorneys for the Defendant*